# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MICHAEL WILLIAM FLINNER,
Defendant and Appellant.

S123813

San Diego County Superior Court
SCE211301

November 23, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Groban, and Greenwood* concurred.

---

\*      Administrative Presiding Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. FLINNER

S123813


Opinion of the Court by Kruger, J.


A jury convicted defendant Michael William Flinner of the first degree murder of Tamra Keck and found true financial-gain and lying-in-wait special-circumstance allegations. (Pen. Code, § 187, subd. (a); *id.*, § 190.2, subd. (a)(1), (15).) The jury also convicted Flinner of conspiracy to commit murder and grand theft (*id.*, § 182, subd. (a)(1); *id.*, § 187, subd. (a); *id.*, § 487, subd. (a)); mingling a harmful substance with food or drink (*id.*, § 347, subd. (a)); and solicitation to commit murder (*id.*, § 653f, subd. (b)). The jury could not reach a verdict on a second count of solicitation to commit murder. Following a penalty phase trial, the jury returned a death verdict and the trial court entered a judgment of death. The court also sentenced Flinner to an indeterminate term of 25 years to life for the conspiracy conviction, a determinate term of four years for the mingling a harmful substance with food or drink conviction, and a determinate term of six years for the solicitation to commit murder conviction. The court imposed but stayed the indeterminate and determinate sentences pending the resolution and execution of the death judgment.

This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I. Factual Background

### A. Guilt Phase

The trial evidence showed that on June 11, 2000, Flinner called his fiancée, Tamra Keck, while she was out shopping. He directed her to meet his former employee, Haron Ontiveros (also known as Juan de la Torre), at a local gas station so that she could help jump start Ontiveros's car. Keck picked Ontiveros up from the gas station and drove to a nearby cul-de-sac where Ontiveros's car was parked. As Keck was propping the hood of her car open, Ontiveros approached her from behind and shot her in the back of the head, killing her.

#### 1. *Prosecution Evidence*

Flinner met Keck in 1999. At the time, Keck was 18 years old and had just started her senior year of high school. Flinner was 31 or 32 years old and was operating a landscaping business after being paroled from prison earlier that year. Flinner and Keck developed a romantic relationship. Keck moved into Flinner's apartment in Alpine, California, and the two made plans to marry.

On December 29, 1999, Flinner and Keck met with an Allstate Insurance agent and applied for a $500,000 term life insurance policy for Keck, naming Flinner as the primary beneficiary. At the meeting, Flinner introduced Keck as his fiancée and represented that she was an employee of his landscaping business with an annual income of $30,000 per year. Flinner explained to the Allstate agent that they were taking out the life insurance policy because Keck was an important part of his landscaping business and that he would suffer financially were something to happen to her. This explanation was false. Keck was not, in fact, a regular employee

of Flinner's business; Keck occasionally purchased office supplies for Flinner, who then reimbursed her, but those payments were irregular and relatively small. Although Flinner did not provide verification of Keck's employment or salary, the agent issued the insurance policy. Flinner and Keck paid for the first insurance premium payment that day, and Flinner paid for the next two premium payments in March and April 2000.

The prosecution sought to show that Flinner's business was suffering financially in the months leading up to the murder and that he accumulated an increasing amount of debt. After Keck's death, Flinner attempted to collect on the insurance policy, attempted to make large purchases on credit with the promise of payment out of his forthcoming insurance proceeds, and continued even in custody to tell fellow inmates that he expected to receive a substantial payout plus interest from the life insurance policy.

The prosecution also presented evidence that Flinner's relationship with Keck was strained. Flinner took another teenage girl, Tiffany Faye, out for meals several times and told her that although Keck thought they were going to get married, he could get rid of Keck and date Faye. In December 1999, while Faye was visiting Flinner and Keck at their apartment, Flinner proposed a "threesome," which prompted Faye to break off her relationship with Flinner. Various witnesses testified that Flinner treated Keck poorly, said Keck was just after his money, and referred to her by derogatory names. Two days before the murder, Keck called her mother, crying, to report the wedding was going to be postponed.

Around the time Flinner and Keck took out the life insurance policy, Flinner began asking associates what it would

cost to have someone killed and whether they would kill someone on his behalf. Robert Johnston, one of Flinner's employees, testified that sometime between December 1999 and January 2000 Flinner asked whether Johnston would kill somebody for him. Charles Cahoon, who worked briefly for Flinner, testified that in January 2000, Flinner asked Cahoon how much it would cost to have somebody killed and whether $10,000 would be enough. When Cahoon asked Flinner what he was talking about, Flinner said that he had gotten Keck insured for $1,000,000. Juan Morales testified that in April 2000, while paying Flinner for a car Morales had bought from him, Flinner asked Morales if he knew where to get a gun.

A few days before the murder, Flinner obtained the car that codefendant Haron Ontiveros, one of Flinner's landscaping employees, would use on the day of the murder.[1] Flinner visited an auto dealership that he had done business with before and signed a borrower agreement for a small white Nissan NX car. Amir Bahador, an employee at the auto dealership, testified that when Flinner came to pick up the Nissan NX, he was accompanied by a "Hispanic gentleman, kind of short, kind of stocky," though Bahador could not say for sure that it was Ontiveros. Flinner told Bahador that he was getting the car for his employee, the man who was with him at the dealership.

---

[1] Ontiveros was tried jointly with Flinner before a separate jury, which found Ontiveros guilty of first degree murder and conspiracy to commit murder and found true the lying-in-wait and financial-gain special circumstances. At the penalty phase, Ontiveros's jury returned a verdict of life in prison without the possibility of parole, and the court sentenced Ontiveros to life in prison without the possibility of parole for the murder conviction and a concurrent term of 25 years to life for the conspiracy conviction.

After the murder, Flinner also gave Ontiveros a forged check for $7,000 in payment for his role.

On the morning of the murder, at about 10:45 a.m., video surveillance showed Flinner driving his white Ford pickup to the Ultramar gas station in Alpine. Flinner was also placed at that location through his cell phone records and the testimony of Phillip Finch, who drove by Flinner while he was pulled over on the road near the gas station to make a call. The clerk at a nearby Shell station testified that around 10:30 a.m. Flinner purchased gas and milk and asked the clerk to hurry ringing up the purchase because he "was late to meet his friend down the street."

At about the same time, video surveillance showed the white Nissan NX driving into the Ultramar gas station. Shortly thereafter, video showed both Flinner's Ford pickup and Ontiveros's Nissan NX leaving the Ultramar station and heading toward a cul-de-sac down the street. Flinner later admitted to detectives that he entered the cul-de-sac sometime between 10:00 a.m. and 11:00 a.m. on the morning of the murder. Suzanne Scanlan, who volunteered at a veterans' organization that had a view of the cul-de-sac, testified that in this timeframe she saw two white cars parked next to each other in the cul-de-sac. Video footage picked up the two white cars exiting the cul-de-sac road about 15 minutes after they entered.

Flinner arrived at his parents' house at about 11:30 a.m. on the day of the murder. Shortly thereafter, at around 11:45 a.m., Keck and Flinner left Flinner's parents' house separately — Flinner to go shopping and to a car wash with his son and Keck to go to Walmart and Vons. Walmart's video surveillance showed Keck entering and shopping in the store.

While Keck was at Walmart, phone records show she received two calls from Flinner, at 12:08 p.m. and 12:15 p.m., and Flinner confirmed in a police interview that he called Keck while she was at Walmart. Video then showed Keck leaving the Walmart and, instead of driving to Vons, entering the Ultramar gas station.

In the meantime, surveillance video showed the white Nissan NX driving back into the cul-de-sac at 12:02 p.m. A man left the cul-de-sac by foot at 12:08 p.m. and headed toward the Ultramar gas station, where he arrived and waited in front of the station. At 12:32 p.m., video showed Keck's white Mustang coming into the Ultramar station and pulling up to where the man was waiting (although he was no longer visible in the surveillance video), and it then showed the Mustang leaving the station and heading toward the cul-de-sac. About three minutes after the Mustang entered the cul-de-sac, video showed the white Nissan NX speeding out of it.[2]

Shortly after the murder, a motorist discovered Keck's body and called the police. Keck's body was found lying in front of her car. The car's engine was running, the hood was ajar and the passenger side door open. Keck had been shot once in the back of the head. This and other circumstantial evidence indicated that, once she had parked in the cul-de-sac, Keck left her car running and exited the vehicle. While she was opening

---

[2] We consider the details of the evidence concerning the events in the cul-de-sac during these three minutes in further depth below, in connection with Flinner's claim that insufficient evidence supports the lying-in-wait special-circumstance finding.

the hood of her car, she was shot in the head from behind. She died within a minute of being shot.

Flinner attempted to cast the responsibility for Keck's murder on others. In the days before the murder, Flinner had told two sheriff's deputies that one of his landscaping customers was "after him" and had tried to run him off the road, though he dismissed the deputies' suggestion that Flinner file a police report. During an interview with lead detective Rick Scully on the night of the murder, Flinner denied being near the cul-de-sac that day and said he had never been to the cul-de-sac. He again brought up the disgruntled customer and said that one of the customer's associates had recently threatened his life and initiated a physical altercation with him.

Later that night, the police searched Flinner and Keck's apartment. During the search, Detective Scully told Flinner that in his experience people who are found in isolated areas, as Keck was, are usually there for a drug deal or to meet a love interest. At the time, Flinner rejected this theory of Keck's death and police found no evidence suggesting Keck was using drugs. But days later, Flinner contacted police to say he and his mother had found drugs and syringes while going through Keck's possessions, and they turned them over to Detective Scully. Within a week of the shooting, Flinner also reported he had received threatening phone calls from a Hispanic man with whom he had been in an altercation a decade before.

Later in the investigation, Flinner attempted to frame or cast blame for Keck's murder on various employees and business associates. Flinner invited employee Martin Baker to dinner at his house about a month after the murder and spiked Baker's chili with Xanax. While Baker was passed out on Flinner's

7

couch, Flinner called his friend Gilberto Lopez and asked Lopez to call Flinner's home number from a pay phone. Flinner then called the police and said that he had just received a call from a woman who claimed Baker had confessed to Keck's murder and that Baker was currently asleep on his couch.

Next, Flinner apparently tried to frame employee Charles Cahoon by planting a sock that contained bullets matching the bullet that killed Keck in Cahoon's car. DNA on the sock matched Keck's and Flinner's, but not Cahoon's. An anonymous letter accusing Cahoon of murder was also placed on a police car.

Flinner also told detectives that his friend and business associate Rick Host said on his deathbed that Keck was killed due to her knowledge of a casino software scheme Host was involved with that also involved the North Korean government and mobsters in the United States.

Finally, while in custody, Flinner claimed that his codefendant Ontiveros killed Keck after having an affair with her and that Ontiveros had put out a contract on Flinner's life. Flinner also attempted to make it look like he was being targeted, planting bullets with his and Keck's names on them on his parents' property.

Flinner also made several attempts to derail his trial. Flinner attempted to taint the witnesses in his case by mailing them letters containing information deemed inadmissible by the trial court so that the witnesses' testimony would be rendered suspect and impeachable. Flinner asked a fellow jail inmate, Gregory Sherman, to use his library privileges to look up the addresses of witnesses, detectives, the prosecutor, and the trial judge in his case. Flinner told Sherman that he intended to sabotage his trial by sending witnesses letters with confidential

information that would preclude them from testifying. He indicated that he would make it look like his former attorney or a detective in the case sent the letters and would then have an associate "take out" the fall guy. Flinner then sent these names and addresses to a former girlfriend, Catherine McLarnan, along with a cover letter that he directed her to send to all of the witnesses. He instructed her to use the address of his former defense attorney as the return address for the letters. McLarnan instead turned the information over to a defense investigator.

Flinner had a backup plan to sabotage his trial: He told Sherman that he planned to ensure that only property owners with unique names were impaneled as jurors so that he could easily look up their addresses through property records searches and send them similar letters with inadmissible evidence. Flinner said he would frame the prosecutor for sending this set of letters by using the prosecutor's address as the return address.

Flinner also made various threats intended to obstruct the prosecution of his case. He asked fellow inmate James Theodorelos and another inmate to kill his codefendant Ontiveros. When these inmates began cooperating with the prosecution, Flinner tried to intimidate them or pay them off. Finally, Flinner tried to intimidate the prosecutor by sending letters conveying threats against the prosecutor to Flinner's family and other inmates, knowing the letters were being photocopied and read by the authorities.

Flinner made a number of statements after Keck's death that suggested he was complicit in her murder. Robert Pittman, a former employee of Flinner, testified that the morning after

the murder Flinner called him and said that Keck had been shot in the back of the head, even though this information was not public at the time and the pathologist had not yet determined whether Keck was shot in the face or in the back of the head. Flinner described other details about the crime at times when they were not publicly known, such as that Keck's car was running when found.

A few days after the murder, Flinner went out to dinner and drinks with his friend Gilberto Lopez and Lopez's girlfriend Marie Locke. According to Lopez, Flinner got "tipsy" at the meal and became upset about Keck's death, stating either "I shouldn't have killed her" or "I should not have had her killed." On another occasion after Keck's murder, and after Flinner had taken several sleeping pills, Flinner again said to Lopez, "I shouldn't have killed her." In custody, Flinner told fellow inmate Theodorelos that Keck's murder stemmed from an ill-fated business transaction with "some overseas Asians." But Flinner subsequently told Theodorelos that he was sure to make credit card purchases at the time of Keck's murder to create an alibi for himself and that he had bullets planted on his parents' property and an anonymous note accusing Cahoon of killing Keck left on a police car.

## 2. *Defense Evidence*

The defense argument was that Flinner had nothing to do with Keck's murder. Flinner presented evidence that he was loving and kind toward Keck. He also put on evidence intended to bolster several exculpatory theories Flinner had raised during the investigation and before trial. According to Donald Landon, a business partner of Flinner's friend Rick Host, Host was at the same Walmart as Keck the morning she was killed. Landon also

testified about Host's gambling ventures. Flinner's father testified that Flinner had received threatening phone calls after the murder and that Flinner's parents had received anonymous calls as well. The defense also presented evidence that there was a tunnel near the crime scene big enough for an adult to pass through that people used to pass under the nearby highway.

Flinner sought to discredit some of the People's evidence. A forensic accountant testified that while the prosecution had calculated Flinner's debt at the time of the murder to be $194,000, the accountant calculated it to be about $94,000. A custodian of records for a local news channel produced recordings of news broadcasts about the murder and testified that the channel publicized that Keck was shot in the head the morning after the murder, which could have explained how Flinner was able to report this information to Pittman on the same day; on cross-examination, however, the witness clarified that at no time did the broadcasts say that Keck was shot in the *back* of the head, as Pittman had testified Flinner told him. Prison inmate James Baggett testified that inmate Theodorelos said he intended to fabricate the statements from Flinner about the murder. Flinner's DNA expert challenged the prosecution expert's conclusion that DNA found on the sock in Cahoon's car belonged to Flinner. A defense investigator testified that Martin Baker, one of the employees Flinner had tried to frame for Keck's murder, had been prescribed Xanax after receiving treatment at the county mental health hospital, and defense counsel elicited Baker's testimony on cross-examination that at the time of trial Baker was living in an assisted care facility and taking several antipsychotic medications. A defense investigator testified that after reviewing of the gas station

surveillance tapes, he was unable to identify the driver of the white Ford pickup truck.

## B. Penalty Phase

The prosecution introduced the testimony of Keck's family members, who described her early life and the impact that losing Keck had on them. The prosecution also introduced the testimony of four women, including Flinner's former wife, who described being sexually assaulted by Flinner after he drugged them, or other forms of physical and emotional abuse. Finally, the prosecution introduced evidence of Flinner's prior felony convictions for forgery, possession of stolen property, rape by a foreign object, three counts of grand theft, and failure to appear while on bail.

The defense called Flinner's mother and father, who testified about Flinner's troubled childhood, including hyperactivity, various head injuries, behavioral problems, and psychiatric hospital admissions. The defense introduced expert psychiatric evidence that Flinner suffered brain dysfunction from early childhood, possibly exacerbated by the use of illegal drugs and head injuries, which contributed to his criminal and antisocial behaviors. Prison officers testified that Flinner had previously attempted suicide after he was returned to prison. A correctional consultant testified about the security measures that would be in place if Flinner was sentenced to life without the possibility of parole. Flinner's friend and a fellow inmate testified about Flinner's efforts to help them during previous emergency situations. Flinner's son testified that he loved his father, who had kept in touch since he was arrested.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Pretrial Detention*

Flinner raises four claims of error stemming from Flinner's pretrial relocation from a downtown San Diego jail facility to a more remote jail facility in Vista, which is in the northern part of San Diego County. We conclude these claims lack merit.

#### a. *Background*

Flinner was detained in San Diego County facilities while awaiting trial. In January 2002, defense counsel requested that Flinner remain in the downtown jail and not be moved to the jail in Vista. The court entered a "request[]," but not an order, to that effect.

As explained in greater detail above, while in jail Flinner sought to disrupt his upcoming trial. With the help of Gregory Sherman, a fellow jail inmate with library privileges, Flinner obtained personal information about the prosecutor and trial judge, including their home addresses. Sherman later gave his account of their activities to the San Diego County District Attorney's Office. The information was passed to the San Diego County Sheriff's Department, as well as the trial judge, Allan J. Preckel.

At a January 17, 2003, ex parte hearing, the prosecutor discussed this information with Judge Preckel. Immediately afterward, Judge Preckel held a security meeting with sheriff's department personnel, the supervising judge of the courthouse, and the prosecutor, but not defense counsel. The supervising judge requested Flinner be moved to a more secure housing unit to prevent him from gathering further information and

attempting to manipulate events outside the jail. The assistant sheriff proposed the Vista facility as having the most secure cells but noted that if Flinner were moved to Vista the court would be "hearing from the defense attorney." Judge Preckel agreed Flinner's attorneys would be displeased, but the supervising judge indicated he approved of the move. No order was issued.

Later in January 2003, the sheriff transferred Flinner to Vista and placed him in administrative segregation, restricting his visitation and telephone privileges. At a conference with all parties and counsel on February 28, 2003, the trial court summarized Flinner's custodial status as related by the sheriff's office: Flinner was housed in an isolation cell and allowed no contact with other inmates; he was permitted three 20-minute telephone calls per week to Sandra Resnick, one of his two attorneys, and 45-minute personal visits with Resnick or John Mitchell, his other attorney, if they gave a day's notice. The court added that Flinner was permitted visits with the defense investigator. The court emphasized that it had not ordered these restrictions and was generally not inclined to interfere with the sheriff's decisions on jail operations. Attorney Resnick complained that the distance to Vista and the limits on communications would slow down the defense team's preparation for trial; in particular, Resnick expressed frustration at the inability of defense team members other than herself to arrange telephone conversations with Flinner. In response, the court stated it was willing to consider making orders to allow increased contact "as they are presented to me."

After the February 28 conference, the trial court issued an order providing information Sherman had supplied to Flinner's attorneys but prohibiting them from revealing the information to Flinner or other members of the defense team. On March 11,

defense counsel, in an ex parte hearing, complained about the restrictions on their communication with and access to Flinner.[3] Counsel's primary concern was that their relationship with Flinner would be disrupted by their inability to tell him about Sherman's disclosure. Attorney Mitchell stated that the restriction "requires me to lie to my client, at least by omission and possibly by commission." Attorney Resnick explained that Flinner had been asking why he had been moved to Vista and had his telephone privileges restricted. By not telling him the reasons these security measures had been taken, Resnick "almost began to feel as though [she] was lying to [her] client by omission."

Attorney Mitchell also elaborated on the difficulties with the Vista location and the telephone restrictions. Driving to and from Vista meant each visit took half a day. In order to prepare for trial and maintain their relationship with a sometimes difficult client, Mitchell and Resnick each tried to visit Flinner once a week, while their investigator did so twice a week. The telephone restrictions prevented Mitchell or the investigator from talking to Flinner by phone. When Mitchell visited Flinner, jail officers searched his briefcase.

In response, the trial court repeated that it was not inclined to second-guess the sheriff's department as to the appropriate housing for Flinner or, at least "here and now," as to telephone privileges. Attorney Mitchell suggested that, given

---

[3] In the interim, the trial court had, at defense request, issued three orders allowing increased contact between Flinner and the defense team: Counsel and the investigator were given access to Flinner in the holding area before and after court appearances, and two defense trial consultants were permitted contact visits with him.

the security measures in place, the court could relax the prohibition on counsel telling Flinner and their investigator about the information Sherman had provided. The court found Mitchell's suggestion "well taken" and proposed discussing it further at an upcoming conference with all counsel.

On March 14, 2003, after an additional brief ex parte with Flinner's attorneys, the trial court conferred with counsel for all parties, with neither defendant present. The court explained that with Flinner now securely housed at Vista and a mail cover and telephone restrictions in place, the court tentatively planned to lift its previous prohibition on defense counsel discussing Sherman's disclosure with Flinner and members of the defense team, with the proviso that the written materials would still not be provided to Flinner. The court noted that its previous order would remain in place for a reasonable period so that Sherman could be provided whatever additional security was deemed necessary.

Asked for comment, Attorney Mitchell said that the court's proposal to lift the prohibition on talking to Flinner about Sherman's disclosure "makes good sense." He expressed the hope that this "resolution" would allow defense counsel to "finesse" their previous concealments from their client and "move on in terms of the attorney/client relationship. We're going to be together for a while in this matter." As to Flinner's housing and telephone restrictions, Mitchell "assume[d]" that the defense was "stuck with that," that as the court had said earlier, "You run the courtroom and they run the jail, and you're not going to get involved unless it fouls up your courtroom." Mitchell went on to observe that a time might come when the defense needed greater access to Flinner, for example to have an

expert consult by telephone, "but we may be able to do that on a case by case basis, so I'll kind of leave that aside."

The prosecutor raised no objection to the court's tentative order but requested a few days to alert Sherman's current confinement facility and allow them to take necessary security measures. The court set a further conference for March 19, five days later. At that hearing, the prosecutor confirmed necessary measures had been taken, and the court issued the order.

### b. *Discussion*

#### i. *Interference with Attorney-Client Relationship*

Flinner contends that the trial court, prosecutor, and sheriff interfered with his attorney-client relationship by moving him to the Vista detention facility and restricting his telephone and visiting privileges, in violation of his constitutional rights to due process and the assistance of counsel. Flinner maintains the imposition of these restrictions "greatly interfered with the preparation of [his] defense by requiring a time-consuming 82 mile round trip for each visit, barring visits from members of the defense team other than appointed counsel, and sharply limiting the time counsel had to confer with their client." The trial judge, Flinner argues, also violated his constitutional rights by permitting the sheriff to impose these restrictions without a contested evidentiary hearing to determine the credibility of Sherman's disclosure, and by ordering defense counsel to "lie" to their client by concealing the disclosure from him.

At the threshold, we agree with the Attorney General that these claims were forfeited by Flinner's failure to raise them below. Although defense counsel complained of the

inconvenience of visiting Flinner at the Vista facility and of his limited telephone privileges, counsel never asserted these conditions infringed on Flinner's right to counsel or, for that matter, any other legal right. Nor did Flinner or his attorneys demand an evidentiary hearing on whether he could be kept in administrative segregation based on Sherman's report.[4] Having made no objection or request on these grounds, Flinner failed to preserve his due process and right to counsel claims.

Nor do the claims have merit. Visiting Flinner at the Vista facility was undoubtedly inconvenient for the defense team, but nothing in the record suggests Flinner's housing or telephone restrictions prevented counsel from effectively communicating with Flinner in order to prepare for trial. The trial court, at defense request, permitted increased communication with members of the defense team (see fn. 3, *ante*) and the court said nothing to preclude further accommodations as needed "on a case by case basis," as Attorney Mitchell put it. Trial counsel's

---

[4] Attorney Mitchell initially stated he was "concerned by the acceptance of what this individual [Sherman] said as being the truth." But he never asked for an evidentiary hearing to determine that point. After Judge Preckel explained that he was inclined to substantially credit Sherman's information — because the informant had "provided a lot of detail," much of which rang true, and he "knows too much to simply be creating this out of whole cloth" — Mitchell did not raise the point again.

At oral argument, defense counsel asserted that further defense complaints or requests would have been futile because the trial judge had disavowed any authority over jail confinement conditions. The record does not support this assertion: Though the judge indicated he would generally defer to the sheriff's department, he also agreed to make changes after defense complaints, and did not close the door to additional accommodations.

principal concern, the court's order prohibiting them from telling Flinner about Sherman's report, was in place less than three weeks before being resolved by the trial court's revised order on March 19, 2003. At the March 14 hearing, Mitchell expressed the hope this would allow any damage to the attorney-client relationship to be repaired over the long pretrial and trial period to come, and Flinner points to nothing in the record suggesting it did not.

Had Flinner requested a hearing on his placement in administrative segregation, and done so in an appropriate forum, he might have been entitled to one. (See *In re Davis* (1979) 25 Cal.3d 384, 390–391 [where state prison regulations set out "specific circumstances under which administrative segregation may be imposed," " 'the inmate has an interest, conferred by statewide regulation and protected by due process, in not being confined in maximum security segregation unless he is found, for clearly documented reasons, to come within the standard set by the rules' "].) But without any such request at the time, and with no indication in the record that Flinner's housing placement deprived him of any trial right or prejudiced the result of his trial, he is not entitled to a reversal on this ground.

### ii. *Violation of Right to be Present at All Critical Stages of Proceedings*

Flinner next asserts that the trial court violated his right to be present all critical stages of proceedings, pointing to the ex parte discussions with jail personnel and the in camera discussions with the attorneys. Contrary to the Attorney General's argument, Flinner had no effective opportunity to object to proceedings at which he was not present, and therefore did not forfeit his due process claim. The claim fails on the

merits, however, because none of these pretrial proceedings, which concerned only the circumstances of Flinner's confinement in jail, were critical to the determination of guilt or penalty.

A defendant has the constitutional right to be personally present in court "where necessary to protect the defendant's opportunity for effective cross-examination, or to allow him to participate at a critical stage and enhance the fairness of the proceeding." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1299.) It does not extend to "in camera discussions on matters bearing no reasonable, substantial relation to the defense of the charge." (*Ibid.*) And while ex parte proceedings are generally disfavored, "the trial court retains discretion to conduct in camera, ex parte proceedings to protect an overriding interest that favors confidentiality." (*Ibid.*) The same standard for requiring the defendant's personal presence applies under California law, and to prevail on such a claim under federal or state law the defendant bears the burden of showing "that his absence prejudiced his case or denied him a fair trial." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357; accord, *People v. Blacksher* (2011) 52 Cal.4th 769, 799.)

The ex parte proceedings in this case were occasioned by the revelations of a jailhouse informant, Sherman, that while in jail Flinner had been engaging in investigative activities aimed at disrupting his upcoming trial, including obtaining personal information about the prosecutor and trial judge. The trial court acted within its discretion in excluding Flinner, and initially his attorneys, from these proceedings until Flinner had been placed in a more secure housing unit where his communication with other inmates could be controlled. Most important, Flinner fails to demonstrate that his absence from the hearings on his

housing and telephone privileges resulted in any actual prejudice to his defense. The ex parte hearings did not concern the conduct of the trial, but only pretrial security measures. And as observed above, despite the inconvenience caused by Flinner's housing in Vista and the discomfort defense counsel felt about temporarily concealing Sherman's disclosure from Flinner, the record gives no indication the defense team was ultimately prevented from effectively preparing for trial.

### iii. Prosecutorial Bias

Flinner argues that the prosecutor was biased against him after the prosecutor learned of Flinner's death threats against him. Flinner asserts that this bias is manifest in the decision to have Flinner transferred to the Vista jail, a decision for which, he asserts, the prosecutor was at least in part responsible. During a February 28, 2003, status conference, Defense Attorney Resnick told the court that a sheriff's captain at the Vista facility said the security of Flinner's confinement was being monitored by Deputy District Attorney Paul Morley, a division chief within the district attorney's office. Based on that apparent involvement by the prosecutor's office, Flinner asserts the trial prosecutor, Deputy District Attorney Rick Clabby, misrepresented his influence in assuring defense counsel, "I have absolutely no control over what the jail does."

Flinner forfeited this claim by failing to raise it below. Once the information provided by Sherman became available to defense counsel, any claim of prosecutorial bias could and should have been raised by a motion under Penal Code section 1424 to disqualify Prosecutor Clabby for a claimed conflict of interest. Counsel neither moved for disqualification nor asserted by any other means that Clabby harbored a

disqualifying bias against their client. "Defendant's failure to move to disqualify the district attorney in the trial court bars appellate review of the claim." (*People v. Maury* (2003) 30 Cal.4th 342, 438.)

In any event, nothing in the record indicates that Flinner's threats and insults aimed at Prosecutor Clabby created a bias that threatened the fairness of the proceedings. If the existence of threats were sufficient by itself to require disqualification, a disruptive scheme like Flinner's could easily succeed. "[W]ere it possible for a defendant charged with serious crimes to disqualify the prosecutors trying the case from proceeding with the prosecution by threatening them, willful defendants would be handed a powerful weapon to disrupt the course of justice." (*Millsap v. Superior Court* (1999) 70 Cal.App.4th 196, 204.) The fact that the district attorney's office was monitoring Flinner's housing status and communications restrictions does not show that Clabby or any other member of the office acted improperly. Having learned from Sherman of Flinner's plans to disrupt the trial, prosecutors had a legitimate interest in seeing that security measures were taken to prevent those plans from being executed.

### iv. Judicial Bias

Flinner also argues Judge Preckel was biased after he was warned that Flinner had made a threat against him. Flinner infers bias from Judge Preckel's "refus[al] to become involved in the unconstitutional restrictions the prosecutor and jailer had arranged, which improperly limited appellant's access to his counsel." Flinner argues it was therefore a due process violation for Judge Preckel to preside over his trial.

The Attorney General argues this claim was forfeited by Flinner's failure to move for Judge Preckel's recusal. Flinner responds that his codefendant had already used a peremptory challenge (Code Civ. Proc., § 170.6) against the judge previously assigned. He concedes, however, that he could have requested recusal on grounds of bias (*id.*, § 170.3, subd. (c)(1)), though he insists that would have "run the risk of further alienating" Judge Preckel. We agree with the Attorney General that if Flinner believed his threat had resulted in a bias against him on Judge Preckel's part, he should have requested the judge recuse himself on that basis, either via the statutory procedure cited above or by a nonstatutory motion invoking Flinner's right to due process. Instead, according to Attorney Mitchell, Flinner said he "feels he's very comfortable" having Judge Preckel preside over his trial. Flinner cannot now ask for reversal on the basis of a claimed error he accepted without complaint below.[5]

We also reject Flinner's due process claim on its merits. A due process claim of this type requires a showing that "under the 'extreme facts' of the case, 'the probability of actual bias rises to an unconstitutional level.' " (*People v. Freeman* (2010) 47 Cal.4th 993, 1001.) Here there are no extreme facts and no probability of actual bias. Although Sherman had reported that Flinner raised the possibility of trying to kill his prosecutor and trial judge, there was no indication of imminent or severe

---

[5]     Flinner cites *Arizona v. Fulminate* (1991) 499 U.S. 279, 310, for the proposition that a structural defect like trial by a biased judge cannot be forfeited. The cited passage, however, states only that such structural defects are not subject to harmless error analysis; it says nothing about forfeiture.

23

danger to Judge Preckel or anyone else. When first discussing Sherman's information with the court, the prosecutor summarized the general threat level from Flinner as justifying "concern[]" and "aware[ness]," but did not "assess[] it much higher than that." The record provides nothing to support Flinner's assertion that the judge "likely feared" Flinner.

As for the court's deference to the sheriff's department on details of Flinner's housing and communications restrictions, such deference creates no inference of fear or bias. It is as consistent, or more so, with Judge Preckel's repeated explanation that he respected the lines between judicial and law enforcement authority and expertise, and therefore would no more tell the sheriff how to run the jail than he would expect that officer to tell him how to run his courtroom.

Nor, finally, did Judge Preckel display indifference to Flinner's rights and interests. To the contrary, he showed a willingness to make and change orders as defense counsel convinced him was necessary for the attorney-client relationship and the defense team's trial preparation. No probability of unconstitutional bias appears from the record.

### 2. Denial of Flinner's Severance Motions

Flinner contends that he was denied the right to due process and a fair trial when the trial court declined to fully sever his case from that of his codefendant Ontiveros and instead empaneled two separate juries for a joint trial.

"Penal Code section 1098 provides, in relevant part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' 'Joint trials are favored because they "promote [economy and]

efficiency" and " 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " ' [Citation.] 'When defendants are charged with having committed "common crimes involving common events and victims," as here, the court is presented with a " 'classic case' " for a joint trial.' [Citation.] We review a trial court's denial of a severance motion for abuse of discretion, based on the facts at the time of the trial court's ruling. [Citation.] 'Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819 (*Daveggio*).) "Conversely, even if a trial court acted within its discretion in denying severance, ' "the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).) "Defendants bear the burden of establishing that the trial was grossly unfair and denied them due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt." ' " (*Daveggio*, at p. 821.)

Before trial, the prosecution conceded that dual juries were appropriate but contended that the cases should proceed in a single trial. Flinner's counsel moved to sever the cases completely on the ground that Flinner and Ontiveros intended to present antagonistic defenses. Flinner planned to argue that he was not involved at all in Keck's killing, while Ontiveros intended to show that Flinner was the mastermind of the murder and manipulated Ontiveros into participating. As we

have explained, " '[m]utually antagonistic defenses are not prejudicial *per se.*' " (*Thompson, supra*, 1 Cal.5th at p. 1081, quoting *Zafiro v. United States* (1993) 506 U.S. 534, 538.) In *Daveggio*, for example, we rejected an antagonistic-defense argument similar to the one raised here, in which one codefendant's defense was that her codefendant "controlled her and was the instigator of their joint crimes." (*Daveggio, supra*, 4 Cal.5th at p. 819.)

Flinner posits that the conflict here rises beyond mere antagonism; he claims that the two positions are "completely irreconcilable" because "[i]f the jury believed Ontiveros, it would have to convict [Flinner]." We have explained that "antagonistic defenses require severance only when ' " 'the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " ' [Citation.] 'If the moving party's guilt can be established by sufficient independent evidence, "it is not the conflict alone that demonstrates . . . guilt," and severance is not required.' " (*Daveggio, supra*, 4 Cal.5th at pp. 819–820.)

We made the statements above in the context of a joint trial before a single jury. Whether antagonistic defenses ever require severance in the context of separately empaneled juries is unclear, but we need not decide that general question here. Flinner cannot show, in any event, that in this case the conflict between the two defenses *alone* established guilt, given the overwhelming independent evidence against him, including the video surveillance evidence showing Flinner and Ontiveros meeting shortly before the murder near the scene of the crime and the inculpatory statements Flinner made to Lopez. The nature of Flinner's and Ontiveros's defenses would not have compelled severance even in a single-jury trial. A fortiori, they

did not do so in a dual-jury trial, where evidence properly admitted solely for or against one defendant could be excluded as to the other.[6]

Nor did the existence of Ontiveros's incriminating confession require the trial court to grant Flinner's severance motion. The existence of an " ' "incriminating confession" ' " is one of many "[f]actors that may bear on a trial court's decision to order separate trials." (*People v. Gomez* (2018) 6 Cal.5th 243, 274.) But it is settled that a trial court may resolve admissibility problems posed by a codefendant's confession by empaneling dual juries at a single trial, as the court did here, instead of ordering separate trials. (See *People v. Anderson* (2018) 5 Cal.5th 372, 387; *Thompson, supra,* 1 Cal.5th at p. 1085 [" '[W]e have upheld the use of separate juries for jointly tried defendants, as an alternative to outright severance' "].)

Flinner argues that the single trial raised issues under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and

---

[6] In *Zafiro v. United States, supra,* 506 U.S. at page 539, the high court explained that when defendants have been properly joined, antagonistic defenses call for severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." As examples, the court pointed to the possibility that "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant" or that "[c]onversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." (*Ibid.*) The dual-jury procedure appears to solve most or all such evidentiary problems, suggesting that antagonistic defenses do not require severance where the defendants have separately empaneled juries.

*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) because the prosecution was permitted to introduce parts of Ontiveros's postarrest confession through Detective Scully before Flinner's jury.  As we explain in detail below, no *Bruton* issue arose because Flinner and Ontiveros were tried by separate juries.  Flinner does, however, establish that the trial court committed *Crawford* error in admitting parts of Ontiveros's confession against Flinner.  But it was not the nature of the single trial that produced this error:  Before the high court decided *Crawford*, the trial court ruled portions of Ontiveros's confession admissible against Flinner as statements against penal interest.  The trial court's error was in admitting Ontiveros's statements in violation of the confrontation clause, not in denying Flinner's severance motion.  The basis for the trial court's ruling — that Ontiveros's statements were admissible against Flinner as statements against interest — would have permitted their introduction even at a separate trial.  (See pt. II.B.7., *post*.)

Flinner moved to sever his case again midtrial after Ontiveros's cross-examination of the state's witness Charles Cahoon.  Defense counsel argued that Cahoon's testimony as elicited by Ontiveros's counsel was "not quite character assassination, but . . . awful close to it."  The trial court denied the motion.  Cahoon testified that he was afraid of Flinner, that Flinner was manipulative, and that Cahoon was not involved in the murder, contrary to the allegations in an anonymous letter left on a police sergeant's windshield.  Defense counsel appeared most concerned with the trial court's admission, over Flinner's objection, of Cahoon's statement that Flinner "is a very bad man and he should be stopped" and that "he doesn't deserve to even be with us here on Earth," given in response to a question by

Ontiveros's counsel about why Cahoon belatedly came forward to Detective Scully with information implicating Flinner. Flinner does not now argue that the trial court abused its discretion in denying this second severance motion; instead, he lists Cahoon's testimony as one illustration of how the antagonistic defenses unfairly prejudiced him. We disagree. As we explain later, the trial court did not err in admitting Cahoon's statements, which could with equal propriety have been elicited by the prosecution. (See pt. II.B.1.c., *post*.)

We also reject Flinner's claim that reversal is required because the trial court's failure to sever allowed Ontiveros to act as a "second prosecutor." As we have previously explained in rejecting a similar argument, just "because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379.)

Flinner argues that Ontiveros was permitted to introduce evidence damaging to his defense that the prosecution did not offer, but he does not establish that the prosecution would have been unable to offer the same evidence against him. Flinner's argument focuses in particular on the admission of hearsay statements that he made to Gilberto Lopez that Flinner "shouldn't have killed her" or "should not have had her killed," referring to Keck. Although Flinner complains that Ontiveros and not the prosecution called Lopez and that Ontiveros's counsel did not ask Lopez any question about Ontiveros, the fact remains that the prosecution could have offered the very same evidence against Flinner, regardless of whether the two defendants were jointly tried.

Flinner complains that Ontiveros was responsible for the admission of other pieces of damaging evidence as well, but the evidence in question was in fact introduced by the prosecution, not Ontiveros. For example, Flinner notes that "[i]t was Ontiveros'[s] counsel who had a police sergeant read a portion of an anonymous letter found on the windshield of his patrol car," but it was actually the prosecution that called the sergeant as a witness and projected the relevant portion of the letter for the jury to read. Similarly, Flinner complains that Ontiveros's counsel attempted to impeach a mental health expert called by Flinner to challenge Martin Baker's competency and that Ontiveros's counsel elicited testimony from the state's forensic computer examiner that Flinner used his computer to print fraudulent checks. But in each case, Ontiveros's questioning largely replicated the prosecution's earlier work. Flinner does not argue that any of this evidence was inadmissible, and the fact that it was first introduced by the prosecution rebuts the argument that its damaging effects stemmed from the joint nature of the trial. In any event, "no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses" and one offers evidence "that is damaging to the other and thus helpful to the prosecution." (*People v. Turner* (1984) 37 Cal.3d 302, 313.)

Flinner also points to a number of instances in the record where he claims that Ontiveros was permitted to ask inappropriate questions. In some of these instances, Flinner simply misreads the record. He suggests that Ontiveros's counsel was permitted to present damaging "innuendo" evidence against Flinner when Ontiveros's counsel asked prosecution witness Robert Pittman whether he had ever heard that Flinner's first wife "had died mysteriously." In fact, it was

Flinner's counsel, not Ontiveros's, who posed this question to Pittman. In other instances, Flinner objects to questioning by Ontiveros that was substantially the same as a line of questioning first posed by Flinner or the prosecution. Flinner objects to questions that Ontiveros's counsel posed to witness Sterling Thomas about whether Flinner had asked Thomas to steal his Chevy SUV so that Flinner could file an insurance claim, whether Flinner had "hit on" Thomas's fiancée, or whether Flinner said he wanted to "get rid of" his girlfriend (even though Thomas denied some of these conversations ever took place and said that others were in jest). But it was Flinner who called Thomas as a witness, and Flinner who first brought up the alleged conversation in which Flinner asked Thomas to steal his truck. As for Thomas's testimony that Flinner said he wanted to "get rid of" his girlfriend, it was the prosecution that first elicited the testimony on cross-examination. In any event, regardless of whether Ontiveros was the first to ask the questions or merely followed up on the questions already asked by others, the jury was properly instructed that questions are not evidence, and we presume it followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Flinner argues that Ontiveros's defense strategy reduced the People's burden to prove Flinner's guilt beyond a reasonable doubt, but we are not persuaded. "[T]his was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person. Here the prosecution theory was that both defendants participated in, and were guilty of, the murder." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287.) The prosecution put on substantial evidence of Flinner's guilt, including evidence that Flinner met with Ontiveros the day of

the murder to run through the plan, that Flinner made incriminating statements before and after he was charged with Keck's murder, and that he attempted to pay Ontiveros for his role in the crime.

Finally, Flinner argues that the trial court's failure to sever his case produced gross unfairness because Ontiveros used the codefendants' single peremptory challenge to dismiss the original judge, ostensibly preventing Flinner from dismissing Judge Preckel for alleged bias. As we have explained (pt. II.A.1.b.iv., *ante*), Ontiveros's use of the single statutory peremptory challenge did not prevent the defense from raising a nonstatutory motion for recusal. Thus, any prejudice flowed from Flinner's failure to object and not from the trial court's failure to order severance. And, in any event, as we have explained, Flinner's judicial bias claim fails on the merits; Judge Preckel's presiding did not render Flinner's trial unfair.

## B. Guilt Phase Issues

### 1. Admissibility of Consciousness of Guilt and Witness Fear Evidence

Flinner asserts that the trial court erred in admitting evidence that he obtained or planned to obtain the home addresses of persons connected to the trial, that he threatened the prosecutor, and that certain witnesses were afraid of or intimidated by him.

Under the Evidence Code, "[e]vidence must be relevant to be admissible. (Evid. Code, § 350.) Moreover, even if relevant, it may be excluded if the court determines that its prejudicial impact substantially outweighs any probative value. (*Id.*, § 352.) We afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is . . . more

prejudicial than probative." (*People v. Duff* (2014) 58 Cal.4th 527, 558.)

Flinner argues that the challenged evidence was irrelevant and unduly prejudicial in violation of Evidence Code sections 350 and 352. He also argues that admission of the evidence violated his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments. We address each category of challenged evidence in turn.

### a. *Flinner's Attempt To Obtain Addresses of Witnesses, Judge, Prosecutor, and Potential Jurors*

Flinner first asserts that the trial court erred in admitting evidence that he obtained or planned to obtain the home addresses of various persons connected to his trial. Inmate Gregory Sherman, who was housed in the same area as Flinner at the county jail, was called as a prosecution witness. As noted above, Sherman had special privileges at the jail's law library — including access to unmonitored phone calls and the internet — because he represented himself pro se. He also had past experience tracking down people's addresses through public record searches. Sherman testified that after Flinner learned about his library privileges and skills, Flinner asked him for help in obtaining the addresses of prosecution witnesses, as well as the prosecutor, the judge, and the bailiff in his case.

Flinner explained that he intended to sabotage the trial by flooding the witness pool with letters containing confidential information about the case; he expected this tactic would preclude the witnesses from testifying. He planned to make it look like the letters came from one of the lead detectives in his case or his prior defense attorney, and he told Sherman that he

knew some people who he would then direct to "take . . . out" the person he framed.  If that plan failed, Flinner had a "plan B" that he shared with Sherman:  Flinner would try to ensure that the jurors selected to serve in his case were homeowners with uncommon names, so that he could easily track down their home addresses.  As with the witness pool plan, Flinner would then send the jurors packets of information about the case intended to disqualify the jurors from serving.  For this scheme, Flinner suggested to Sherman that he would make it look like the prosecutor sent the packets.

The prosecution also called Catherine McLarnan, who previously dated Flinner.  She testified that after she visited Flinner in jail, he sent her a package containing a list of names and addresses of witnesses, a letter to send to those witnesses, and instructions on how to prepare the letters.  Flinner asked her to type up the letter, wear latex gloves while preparing the letters and envelopes, and use the address of his former defense attorney as the return address.  He explained that the letter included evidence deemed inadmissible by his trial judge and that, by sending it to all the witnesses, he would be able to " 'ruin the People's case.' "  McLarnan testified that she did not follow Flinner's directions and instead turned the materials from Flinner over to his defense investigator.

Flinner argues that this evidence about his efforts to tamper with the witnesses and the jury was irrelevant and unduly prejudicial, but he does not point to a specific trial objection to this evidence.  We thus agree with the Attorney

General that the issue has been forfeited by lack of objection.[7] We reject the claim for lack of merit in any event. As the jury was instructed (with a version of CALJIC No. 2.06), a defendant's efforts to suppress harmful evidence can be probative of the defendant's consciousness of guilt. Sherman's and McLarnan's testimony concerning Flinner's plans to tamper with the witnesses and jury pool was relevant to show his consciousness of guilt. Nor was this evidence was unduly prejudicial: None of this testimony suggested that Flinner intended to threaten or harm the *jurors*, as opposed to a detective or defense attorney, and we conclude that any prejudice that may have arisen from jurors' awareness that

---

[7] In response to the Attorney General's forfeiture argument, Flinner points to an asserted trial court order that all defense objections are made on all relevant state and federal grounds. As we explain later in this opinion (see pt. II.B.3., *post*), the order in question did not operate to generally excuse Flinner from objection requirements. He also attempts to demonstrate that the trial court did, in fact, consider an objection to the evidence and overruled it. But there is nothing in the record to support the contention. Flinner invokes a "discussion regarding appellant's alleged efforts to suppress or fabricate evidence," but cites a transcript page that does not exist. Next, Flinner points to the trial court's consideration of a pretrial motion which the court characterized as concerning "purported efforts by and on behalf of Mr. Flinner to fabricate and/or suppress evidence" but none of the documents (letters authored by Flinner) that the court went on to consider concern Sherman or McLarnan. Finally, Flinner points to a hearing in which, he says, the "court overrules defense objections to evidence regarding McLarnan." But the record contains no indication that such a thing occurred at the hearing; instead, it appears from the record that the materials that McLarnan handed over to the defense investigator were first brought to the court's attention at this hearing, and the court agreed to defense counsel's request to consider the materials in camera at a later time.

Flinner sought out and may have discovered the jurors' addresses was outweighed by the probative value of this testimony.

### b. *Flinner's Threats to the Prosecutor*

Flinner also claims that the trial court erred in admitting portions of three letters he wrote expressing hatred toward the prosecutor and threats against the prosecutor or his family. The first is a letter that Flinner wrote to his mother, where he characterized the prosecutor as a "little maggot." The letter goes on to state: "You'd think a guy who achieved as he is could afford more than a $263,000 mortgage. [¶] . . . [¶] . . . His wife must be unquestionably ill-bred, empty, and misguided being with him, either that or one hideous, sordid shrew with a back harrier [*sic*] than his own. . . . I hope he dies young. The Freedom of Information Act is a great thing. . . . Looking forward to getting out of here and moving to Chula Vista so I can hang out with all of my great friends."

The second letter is one that Flinner wrote to an inmate at another prison with whom Flinner corresponded frequently. It reads, in part: "Have you ever heard of the Freedom of Information Act? Why is it okay for him to know all about me, and yet I'm not supposed to know anything about him? . . . One cannot be a true adversary without knowledge of his opponent and his critical position in life. . . . [¶] . . . [¶] . . . He has me locked away in solitary confinement so as not to be able to talk to the other convicts, et cetera. But I ride four busses [*sic*] when I go to court and can speak to whomever I wish. Many people know the things that I want them to know. One thing is for sure, this shit is a long way from over. [¶] Anyway, just thought I'd

put that out there in case this sorry piece of shit happens to read this, miserable mother fucker."

The third letter Flinner points to is one he sent to another inmate. The court admitted only part of this letter, which included the following statement: "By the way, the dicks [on top of each page of the letter] are for the D.A.'s memory. He's [*sic*] trying to send him a subliminal message, actually a series of them. First, I will fuck him in front of his wife and kids when I'm free."

Before trial, the prosecution had sought to admit these and several other letters written by Flinner disparaging the prosecutor, illustrating Flinner's knowledge of personal details about the prosecutor like his home address and wife's name, disclosing such information to other inmates, and threatening harm to the prosecutor and his family. The prosecution argued that this evidence was relevant to showing Flinner's efforts to intimidate the prosecutor and thereby hinder the prosecution of the case. Although these letters were sent to third parties and not directly to the prosecutor, the prosecution asserted that Flinner knew his letters were being photocopied and monitored by the authorities. Defense counsel objected to the admission of the letters, arguing that Flinner was merely "venting his frustrations regarding his situation rather than attempting to hinder the prosecution of this case" and was just trying to "get[] a rise out of" the prosecutor. To the extent the letters were relevant, Flinner urged, they should be excluded as unduly prejudicial. The court agreed with the prosecution that these letters supported the inference that Flinner was trying to alter the course of the prosecution by intimidating the prosecutor, but it carefully walked through the letters and excluded many entirely and others in part under Evidence Code section 352.

We conclude the trial court did not err in admitting the portions of the three letters of which Flinner now complains. We agree with the trial court that these letters contained not-so-veiled threats against the prosecutor and his family, which were relevant to whether Flinner attempted to suppress evidence by obstructing the prosecution of his case and thus tend to demonstrate consciousness of guilt. (See *People v. Hamilton* (1985) 41 Cal.3d 408, 429 [where the defendant knew his jailhouse letter would be copied and read by authorities, his reference to threats against the prosecutorial team made by an acquaintance, which were to be carried out if the defendant was convicted, constituted a form of "subtle attempt at intimidation"].) We also conclude that the court acted within its discretion in admitting under an Evidence Code section 352 analysis the portions of the letters that Flinner points to here. We do not think the jury would be biased by the derogatory characterizations of the prosecutor as a "little maggot" or a "miserable mother fucker," especially in light of the evidence of the actual crimes at issue in this case. The probative value of Flinner's pointed references to details about the prosecutor's personal life outweighs any prejudice that might have arisen from the jurors' knowledge that Flinner was targeting the prosecutor. We cannot say the trial court abused its wide discretion in admitting these threats.

Finally, Flinner suggests that it was unduly prejudicial to expose the jurors to both the violent threats Flinner made against the prosecutor and his attempts to collect the jurors' own addresses. He reasons that the jurors might have inferred that he would retaliate against them or their families, too, and they would be prejudiced against him as a result. We conclude the trial court did not abuse its discretion by admitting either

category of evidence. As we have already explained, the probative value of Flinner's attempts to obtain jurors' addresses and his threats against the prosecutor was significant, and we are not convinced that any additional prejudice arising from the synergy of these two strains of evidence substantially outweighed that probative value.

### c.  *Witnesses' Fears of Flinner*

Flinner argues that the trial court erred in admitting the testimony of three witnesses in which each expressed fear of Flinner. The Attorney General argues that, in each instance, the witness's fear of Flinner was relevant to the witness's credibility and therefore admissible. We consider each witness's testimony in turn.

Witness Charles Cahoon testified about Flinner's attempt to frame him for Keck's murder. The prosecution sought to show that Flinner was responsible for planting a sock with bullets inside it in Cahoon's car. Cahoon testified that he saw Flinner break into his apartment shortly before Cahoon found the sock in his car, and that Cahoon realized his car keys were missing shortly after the apartment break-in. On cross-examination, Flinner's attorney elicited testimony that, when Cahoon first reported the incident to the police, Cahoon said the intruder looked like a Mexican person and resembled Flinner's friend, Gilberto Lopez. During later cross-examination by Ontiveros's counsel and redirect examination by the prosecution, Cahoon explained that he had always thought the intruder was Flinner but had been reluctant to name him because Cahoon was afraid of Flinner. Over Flinner's objection, the trial court permitted Cahoon to explain why he ultimately chose to come forward and name Flinner: "Because I think he is a very bad man and he

should be stopped. And I think he doesn't deserve to even be with us here on Earth."

On recross-examination, Flinner's counsel attempted to impeach Cahoon by portraying Cahoon as a biased witness who was trying to ensure Flinner's conviction. Defense counsel elicited Cahoon's testimony that Cahoon had been trying to find out what he "could do to go ahead and help to get [Flinner] off the street and away from the public eye and so he couldn't hurt or kill anybody else." And Cahoon confirmed, upon defense counsel's followup, that this was his "angle" — that he did not like Flinner and did not think he "should be with us here." At defense counsel's request, the trial court struck other portions of Cahoon's testimony as nonresponsive, including Cahoon's statement that he was still scared of Flinner and thought "what he's doing to [codefendant Ontiveros] is ridiculous."

We conclude the trial court properly admitted this testimony. Cahoon's description of his initial fear in response to questioning by the prosecution and by Ontiveros's counsel were relevant to Cahoon's credibility: His fear of Flinner provided an explanation for why he did not immediately name Flinner as the home intruder. Cahoon did express strong negative feelings about Flinner alongside his fear; some of his statements held a potential for prejudice within the meaning of Evidence Code section 352. But the trial court did not abuse its broad discretion to balance that potential against the statements' probative value in showing how Cahoon overcame his fear of testifying. We note as well that Cahoon's later statements against Flinner — that Cahoon was testifying in order to get Flinner "off the street and away from the public eye and so he couldn't hurt or kill anybody else" and that he did not think Flinner "should be with us here" — were elicited by Flinner's own attorney,

presumably believing these statements useful to show Cahoon's bias. Flinner cannot claim error in admission of evidence he elicited. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [if there was error, it was invited]; *People v. Escobar* (1996) 48 Cal.App.4th 999, 1022, fn. 4 [rejecting defendant's claim of inadmissibility of evidence where defendant "not only failed to object to the admission of the evidence, but . . . sought its admission"].)

Next, Flinner argues that the trial court erred in admitting prosecution witness Ronald Millard's statement that, although Flinner had never threatened or harmed him, Millard felt intimidated by Flinner. Millard, who had worked for Flinner, testified to aspects of the relationship between Flinner and Ontiveros. On cross-examination, Flinner's attorney asked the following questions:

"Q: Did Mr. Flinner ever threaten you personally?

"A: No.

"Q: Did Mr. Flinner ever touch you physically?

"A: No.

"Q: Did Mr. Flinner ever do anything to make you personally afraid of him where he said something to you concerning anything.

"A: He's a very intimidating man."

As with Cahoon's later statements of fear, defense counsel initiated this line of questioning and did not ask the trial court to strike Millard's answer that Flinner is "a very intimidating man," the only portion of Millard's testimony to which he now objects. Under these circumstances, his claim of error is not

cognizable on appeal. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1139.)

Finally, Flinner returns to McLarnan's testimony. The prosecutor asked McLarnan what she did upon receiving the letter from Flinner asking her to send letters to witnesses in his case. When she said that, at first, she "didn't do anything with it" and ultimately turned it over to the defense investigator, the prosecutor asked whether she ever contacted police or the district attorney's office to tell them about Flinner's letter. She said she had not. The prosecutor proceeded to ask her whether she had been concerned about her family's safety should Flinner find out about her decision not to help him. Over Flinner's objection on grounds of relevance and undue prejudice, the trial court allowed McLarnan to answer that she "was concerned about Michael's reaction" and she "was concerned for [her] son." The prosecutor also introduced portions of a letter she sent to the defense investigator in which she wrote, "I'm seriously concerned for my family's safety should Michael find out about this," and queried, "Do you think we'll need protection?"

We conclude that this evidence was relevant. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) McLarnan's explanation of why she was afraid was "likewise relevant to her credibility" and its admission "well within the discretion of the trial court." (*Ibid.*) McLarnan did not initially tell anyone about the letter that she received from Flinner and never handed the information over to the authorities; her fears of what Flinner would do if he found out about her actions were relevant to why she held this information so closely and did not come forward immediately with it, despite

her understanding that the letter could be seen as tampering with witnesses and hampering Flinner's trial. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1085 ["a trial court has discretion, within the limits of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination, particularly when the prosecution reasonably anticipates a defense attack on the credibility of that witness"].) And this evidence was not unduly prejudicial: Though McLarnan's statements suggest she feared some kind of retaliation from Flinner, she did not testify that Flinner had ever threatened or harmed her, including during their prior relationship or when she visited him in prison. The trial court did not abuse its discretion under Evidence Code section 352 in admitting evidence of her concern.

### 2. *Flinner's Derogatory Statements About Keck*

Flinner argues that the trial court improperly admitted derogatory and callous comments he made about Keck before and after her death. Tiffany Faye testified about a visit that Flinner made to the flower shop where she worked to purchase flowers for Keck's funeral. During the visit, Flinner yelled at a woman driving by in a car, "Hey baby, I'm single now," and laughed. In declining to add a message to accompany the flowers he purchased, Flinner told Faye, "Tammy is dead. It's not like she can read it anyway," and laughed again. David Pemberton, a contractor who met Flinner at their local Chamber of Commerce meetings, testified that Flinner referred to Keck as a "bitch," "cunt," and "slut" in front of her and others. Flinner contends that these statements should have been excluded as irrelevant or, even if relevant, as substantially more prejudicial than probative.

Before trial, the prosecution filed a motion in limine to introduce this and other evidence concerning Flinner's strained relationship with Keck. The prosecution argued that this evidence was admissible in part because it "clearly rebuts [Flinner's] claim that he 'loved' Tamra and therefore could not have killed her." Flinner opposed the admission of much of this evidence, arguing that it was highly prejudicial and irrelevant, but acknowledged that some evidence of Flinner's lack of grief after Keck's death might properly come in. The trial court concluded that evidence of the strained nature of Flinner's and Keck's relationship was relevant and admissible to establish motive, identity, and state of mind, reasoning in part that "defendant is not entitled to have the jury determine his guilt or innocence on a false presentation of their relationship." But the court restricted the evidence that the prosecutor could present to the jury based on an analysis under Evidence Code section 352.

We conclude the trial court properly admitted the contested testimony of Faye and Pemberton. Flinner's derogatory characterizations of Keck, made both in Keck's presence and as well as in front of others, are relevant to proving his strained relationship with Keck and thus his relative willingness to have her killed in furtherance of his own material gain. His callous remarks in Faye's presence shortly after Keck's death are relevant to establishing his lack of sorrow, thus refuting the defense's theory that Flinner was in love with Keck and therefore would not have been involved in her murder. And the probative value of these statements was not substantially outweighed by any prejudicial impact. These disparaging remarks were not particularly inflammatory considering the

44

other evidence that Flinner arranged and facilitated a cold-blooded murder for financial gain.[8]

### 3. *Admissibility of Series of Writings Allegedly Authored by Flinner or at His Direction*

Flinner argues that the trial court erred in admitting a series of letters, a telephone call recording, and two bullet casings with "Tammy" and "Mike" written on them, all allegedly authored by Flinner or made at his direction. He asserts that none of these writings was properly authenticated, in violation of Evidence Code section 1401, as well as his right to confront the witness against him under the Sixth and Fourteenth Amendments. Flinner also contends that this evidence was irrelevant and substantially more prejudicial than probative, and that its admission thus violated Evidence Code sections 350 and 352, as well as his rights to a fair trial and a reliable penalty determination under the Eighth and Fourteenth Amendments.

With respect to a majority of these pieces of evidence, Flinner has forfeited his objection based on lack of authentication. Flinner argues that he preserved all his authentication claims for our review. Without fully explaining his argument on this point, he points to a pretrial ruling in which he claims the court granted his request that all objections by the defense be regarded as having been made on all relevant state and federal grounds. But this ruling was not a sweeping

---

[8] Flinner briefly suggests that his comments about Keck were inadmissible hearsay. But he fails to explain how these comments were offered for the "truth of the matter stated" (Evid. Code, § 1200), as opposed to showing Flinner's state of mind. Nor does he explain why, if considered hearsay, they would not fall within the exception for statements of a party opponent. (*Id.*, § 1220.)

authorization to remain silent at trial and raise objections for the first time on appeal. Instead, the trial court granted, without objection from the prosecution, what the court described as "a rather standard motion in a capital case" filed on behalf of codefendant Ontiveros and joined by Flinner: that defense objections as raised on the record may be deemed, without otherwise being expressly stated, to be objections based on California state constitutional as well as United States constitutional grounds. We have held that "[w]hen 'new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution . . . [a] defendant's new constitutional arguments are not forfeited on appeal.' " (*People v. Redd* (2010) 48 Cal.4th 691, 730, fn. 19; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [explaining that, "[a]s a general matter, no useful purpose is served" by declining to consider such constitutional claims on appeal].) The trial court's order did nothing more than confirm that a defendant does not forfeit an argument on appeal that is "merely a constitutional 'gloss' " upon an objection properly raised below. (*Redd*, at p. 730, fn. 19.) But it is still generally the case that a defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court or when he objects on substantively distinct grounds. (See, e.g., *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [" '[W]e have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable' "].) The trial court did not rule otherwise. And

here, Flinner failed to adequately object to most of the writings he now complains about.

Under the Evidence Code, authentication of a writing — including documents, audio recordings, and "every other means of recording upon any tangible thing" (Evid. Code, § 250) — is required before the writing may be admitted in evidence (*id.*, § 1401). "Authentication is to be determined by the trial court as a preliminary fact ([*id.*,] § 403, subd. (a)(3)) and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' ([*id.*,] § 1400). The statutory definition ties authentication to relevance. As explained by the California Law Revision Commission's comment to section 1400, '[b]efore any tangible object may be admitted into evidence, the party seeking to introduce the object must make a preliminary showing that the object is in some way relevant to the issues to be decided in the action. When the object sought to be introduced is a writing, this preliminary showing of relevancy usually entails some proof that the writing is authentic.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) "The proponent's assertion as to why the writing is relevant determines what the proponent claims the writing is, typically that it has some specific connection to a person or organization, whether through authorship or some other relation. It is this connection that must be proved to authenticate the writing." (2 McCormick, Evidence (7th ed. 2013) § 221, pp. 82–83, fns. omitted; *Goldsmith*, at p. 267 ["The first step is to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case"].)

"The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.) We review a trial court's finding that sufficient foundational facts have been presented to support a writing's admissibility for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

Here, the prosecution introduced the challenged writings for the purpose of showing that Flinner attempted to derail the investigation of Keck's death by framing others for her murder while making himself appear innocent or, indeed, another target of her killer(s). Flinner argues that the prosecution failed to properly authenticate these writings because the prosecution did not make a sufficient preliminary showing that Flinner was the author of these writings or that he directed others to create them. The Attorney General responds that a preliminary showing that Flinner authored these writings was unnecessary because these writings were not offered for the truth of their contents but rather "for the jury to specifically consider whether Flinner authored or caused their production." The Attorney General asserts that "when the content of the writing or the truthfulness of the assertions in the writing are not at issue, authentication as to authorship is largely unnecessary," citing *People v. Adamson* (1953) 118 Cal.App.2d 714, 720 (*Adamson*).

As an initial matter, the Attorney General's interpretation of *Adamson* is flawed and his reliance on the case is misplaced.

*Adamson* stands for a narrower proposition: namely, that preliminarily establishing the author of a writing is not necessary if the authorship of the writing is irrelevant. In *Adamson*, the prosecution had introduced a letter a witness received in order to establish that the witness had acted pursuant to the letter. (*Adamson*, *supra*, 118 Cal.App.2d at p. 720.) The court concluded the prosecution was not required to make a preliminary showing that the letter was genuinely written by the alleged author, because "[w]hether it be genuine or a forgery, it was merely offered to show that [the witness] was motivated by it in his actions." (*Ibid.*) In such instances, where authorship is irrelevant and the sole issues are whether a witness "receive[d] th[e] material, and if so what effect, if any, did it have on [his] mind[]," we have confirmed that establishing authorship is not necessary to properly authenticate a writing.[9] (*People v. Marsh* (1962) 58 Cal.2d 732, 740 [discussing *Adamson*].) Here, unlike in *Adamson*, the prosecution introduced the series of writings at issue precisely for the purpose of establishing that Flinner wrote them or directed their production. Authorship was not irrelevant; it was, rather, the central purpose for which the writings were introduced. For

---

[9] The *Adamson* court's conclusion that authentication is "not necessary" under these circumstances, however, is inaccurate as stated. (See Assem. Com. on Judiciary com., 29B pt. 5 West's Ann. Evid. Code (2015 ed.) foll. § 1401, p. 203.) Although proof of genuineness was unnecessary in *Adamson*, "[u]nder the Evidence Code, the requirement of authentication would require a showing that the letter offered in evidence was in fact the one received and acted upon; and this is the preliminary showing that was found sufficient in the *Adamson* case." (Assem. Com. on Judiciary com., 29B pt. 5 West's Ann. Evid. Code, *supra*, foll. § 1401, p. 203.)

that reason, and contrary to the Attorney General's contention, the prosecution was required to make a preliminary showing that these writings were what the prosecution claimed them to be: writings created by Flinner or at his direction.

That said, we conclude that the writings at issue here were properly authenticated or could have been authenticated had an objection been timely raised. " '[A] writing can be authenticated by circumstantial evidence and by its contents' " (*People v. Landry* (2016) 2 Cal.5th 52, 87 (*Landry*)), and we agree with the Attorney General that "the prosecutor presented circumstantial evidence sufficient to enable the jury to ascertain that [Flinner] was responsible for the writings." We address each of the challenged writings in turn.

### a. Anonymous Letter Implicating Cahoon

A few weeks after Keck was killed, a police officer found an anonymous letter left on the windshield of his police car. The letter claimed that Charles Cahoon had killed Keck. Flinner did not object to the introduction of this evidence on authentication grounds, and his claim is thus forfeited.

Even if Flinner had objected, we conclude it was not an abuse of discretion to admit the letter. The prosecution introduced circumstantial evidence that provided a sufficient preliminary showing for the prosecution to put the letter before the jury, which then had to make the ultimate factual determination of whether Flinner did indeed author it. During the trial, the prosecution introduced other evidence tending to prove that Flinner attempted to frame Cahoon for Keck's murder. Cahoon testified that Flinner broke into his apartment and that shortly after the break-in, Cahoon realized that his car keys were missing. Around the time the police officer found the

anonymous letter framing Cahoon, Cahoon found a sock with bullets inside it hidden in his car, which he turned over to Detective Scully. A criminalist specializing in DNA typing testified that he analyzed DNA found on the sock and concluded that it contained a mixture of DNA from Keck and a man. The male DNA matched Flinner's profile in many respects and the criminalist concluded that it was quite likely that the DNA was in fact from Flinner. He also concluded that the male DNA could not have come from Cahoon. Although this circumstantial evidence of Flinner's other attempts to frame Cahoon is not conclusive of the letter's authorship, it was sufficient to admit the letter. " 'The fact conflicting inferences can be drawn regarding' " the letter's authorship " 'goes to the document's weight as evidence, not its admissibility.' " (*Goldsmith, supra,* 59 Cal.4th at p. 267.)

### b. *Anonymous Letter Implicating Software Developer*

In February 2001, Flinner's mother received an anonymous letter posted from New York and made up of letters cut out of a magazine. The letter's contents made little sense but included the following passage: "My continuing professional work is on improving the reliability of software. . . . We have got a head start of 100 years. Forced to kill the fiancé[e]. She knew too much." The letter also said, "Keep him quiet." Flinner failed to object to the admission of the letter; he therefore has forfeited his appellate claim that the letter should not have been admitted. The claim also fails on the merits. In the months leading up to the letter's delivery, Flinner shared a theory that Keck was killed due to her knowledge of a scheme in which the North Korean government was seeking to have special gambling software delivered to mobsters in the United States. Flinner

said that a friend and business partner, Rick Host, was involved in the scheme. Host passed away after Keck's death, but Flinner claimed that just before Host's death, Host told Flinner that Keck was killed because she had too much information about the gambling software. In light of this circumstantial evidence, one plausible inference is that Flinner had someone send the anonymous letter to Flinner's mother to buttress Flinner's story that Keck was killed due to her connection with the North Korean gambling software scheme, and not by Flinner.

### c. *First Letter Implicating Host and Ontiveros*

Shortly after a press release announced that the police had taken Ontiveros into custody, police intercepted a letter addressed to Ontiveros. The letter was signed "Eli" and blamed Ontiveros for ruining a hit on "the target" and "Mike." It reads, in part, "What were you doing? ICSC with Rick [Host] were acting on behalf of Kwan and they selected the target for a reason. . . . [Y]ou need to keep your mouth shut. If things go bad, blame everything on Mike." The letter also expressed concern "that Rick may have told Mike all that was going on before his death," and purported to remind Ontiveros that he was "instructed not to call or see Rick after . . . giving him back his car." Flinner failed to object to this letter in the trial court and has thus forfeited the claim that it should not have been admitted. And, as with the letter to Flinner's mother, it was not an abuse of discretion to admit this letter. The other circumstantial evidence that Flinner was trying to pin blame on Ontiveros, Host, and the North Korean government supports the inference that Flinner forged this letter.

### d.  Second Letter Implicating Host and Ontiveros

Before trial, Judge Preckel received a letter written in broken English from a person claiming to know Ontiveros.  The letter asserted that "a man named Rick" paid Ontiveros "to kill the girl."  It explained that Keck's boyfriend — who "never know about this" — lent a car to Rick, who then lent it to Ontiveros.  Rick told Keck to pick up Ontiveros, who then shot her in the head.  The letter was signed "A."  Flinner did not object to the admission of the letter and has forfeited his challenge on authentication grounds.  The challenge is also meritless.  As discussed above, the prosecution introduced other evidence tending to prove that Flinner tried to implicate Rick Host in Keck's death.   And the prosecution also introduced other evidence that Flinner attempted to pin the blame for Keck's death on Ontiveros:  Flinner sent a series of letters to religious organizations claiming that Ontiveros killed Keck.  He also sent a letter to United States Representative Duncan Hunter (discussed below) claiming that Ontiveros killed Keck and that her death was related to the gambling software scheme.  In light of this other evidence making it possible to infer that Flinner caused this letter to be sent as part of his plan to shift blame from himself to Host and Ontiveros, it was not an abuse of discretion to admit the letter.

### e.  Anonymous Phone Call Implicating "Ernesto"

A few days after Keck's murder, the sheriff's department received a phone call from a Spanish-speaking woman who declined to identify herself.  She claimed that a man named Ernesto told her that he killed Keck because he wanted to take revenge on Flinner.  The woman explained that Ernesto "had had some problems with Mike like . . . like 10 years ago."  And she said that Ernesto told her that Keck had been driving a

white Mustang the day of the murder, that Ernesto went to Vons or a gas station to pick her up, and that they went to a dead-end street where Ernesto "killed her with a 45." The Attorney General concedes that Flinner objected to the introduction of this phone call on authenticity grounds.

We conclude the trial court acted within its discretion in overruling the defense objection and admitting the phone call. Days after the sheriff's department received the anonymous call, Flinner passed along to Detective Scully a voicemail message that Flinner received from a man with a "strong, Hispanic accent." The caller said, "Mike, I see your wife Sunday [the day of the murder]. I see you next. Bye." Flinner explained to Detective Scully that "[t]he only time [he] ever had a problem with anybody that was Hispanic" was 10 years earlier, when he got into an argument with a group of "Mexican folks." The police had not told Flinner about the anonymous call claiming that Ernesto had killed Keck in revenge for a decade-old problem.

One possible inference in light of this evidence is that the anonymous caller was telling the truth about Ernesto. But another inference, in light of the other, substantial evidence that Flinner attempted to frame others for Keck's death, is that Flinner arranged for the initial anonymous phone call to be placed to the sheriff's department to deflect attention from himself. The factual determination of whether Flinner was responsible for the call was properly put to the jury. Again, " '[t]he fact conflicting inferences can be drawn regarding' " the call's origin goes to the call's weight and not its admissibility. (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

### f.   Bullets with "Mike" and "Tammy" Written on Them

During the investigation, Flinner's father found a container on his property with two bullets in it, which he turned over to the police.   One was a spent casing with "Tammy" written on it, and the other was a live bullet with "Mike" written on it.   The bullets were of the same caliber and make as the bullet that killed Keck.   James Theodorelos, a cooperating informant who met Flinner in prison, testified that Flinner told him that Flinner had "put a few bullets on his parents' property, one had been spent, with the initial of [Keck's] name and the other one was the initial of [Flinner's] name."   Flinner did not object to the introduction of the bullets and has forfeited the claim that they were improperly admitted.  In any event, in light of Theodorelos's testimony linking Flinner to the bullet writings, the trial court acted within the bounds of its discretion in admitting evidence of the two bullets.

### g.   Letters to John Martin

One of Flinner's fellow inmates, John Martin, turned over to Detective Scully two letters that Flinner had allegedly written.  In the first letter, the author claimed that Theodorelos turned on the author:  "You see, [Theodorelos] has taken all of what I've shared about matters and twisted them up into his favor, saying that I told him that I sent the letter from the east to my parents, that I put . . . the casings on my dad's property et cetera."   The letter also asks Martin to "remember the times . . . I had mentioned things like how my folks had received threats from the east coast and how my father found shell casings on his property and things about my business partner telling you that Asians were involved in that deal with my wife and things like that."   The second letter, which appears to respond to an

intermediate letter from Martin, laments that Martin has "decided to flip the script" and says that "the district attorney's office will invariably find their way to you now because of this letter I just got from you." The trial court overruled defense counsel's objection to these letters on foundation and hearsay grounds, and the Attorney General does not argue that Flinner forfeited his authentication objection to them.

We conclude the trial court did not err in admitting these letters because their contents and other circumstantial evidence presented by the prosecution sufficiently authenticated the letters. The content of the first letter connects it to Flinner: The letter discusses the bullet casings that Flinner's father found, the letter that his mother received from New York (a threat from "the east coast"), and the theory that Keck was tied up in a "deal" with some "Asians" (similar to the North Korean gambling software scheme theory). It also faults Theodorelos, the same man who testified against Flinner at trial, for cooperating with the prosecution. (See *Landry*, *supra*, 2 Cal.5th at p. 87 [relying on the contents of a letter to support the letter's authenticity, even where the information relayed in the letter may have been known by individuals other than the alleged author]; see also Evid. Code, § 1421 ["A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing"]; *id.*, § 1410 ["Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved"].) Though the second letter does not contain similar references to personal information about Flinner and his case, the jury could reasonably infer from its contents that it was part of the same conversational chain; the letter reads as if it is a reply from

Flinner to a letter sent by Martin addressing Flinner's first letter. (Cf. Evid. Code, § 1420 ["A writing may be authenticated by evidence that the writing was received in response to a communication sent to the person who is claimed by the proponent of the evidence to be the author of the writing"].)

### h. Letter to Member of Congress

While in jail before trial, Flinner wrote a letter to United States Representative Duncan Hunter. In the letter, Flinner explained that his former employee was responsible for Keck's murder, that "the Korean gaming industry" arranged the murder because Keck "was in possession of crucial software desired to promote and advance political payoffs," and that Flinner had learned all of this from "a now deceased business associate . . . on his death bed." Flinner did not raise an authentication objection in the trial court and has forfeited that claim. In any event, the letter was properly authenticated. Before the letter was introduced, the prosecution had Detective Scully explain how he had requested a mail cover for Flinner's jail mail and that he had accordingly received photocopies of all Flinner's incoming and outgoing mail, including the letter to Representative Hunter. (See, e.g., *Landry*, *supra*, 2 Cal.5th at p. 87.)

Although Flinner lumps this letter in with the other writings to which he objects on authentication grounds, Flinner's complaint about this letter is primarily based on other concerns. Specifically, Flinner claims that jail employees violated Penal Code sections 2600 and 2601 in reading his letter to Representative Hunter and asserts that the letter should have been suppressed on that basis. Penal Code section 2601, subdivision (b) lists a series of civil rights that a person

sentenced to prison retains, including the right "[t]o correspond, confidentially, with any member of the State Bar *or holder of public office*, provided that the prison authorities may open and inspect incoming mail to search for contraband." (Italics added.) Penal Code section 2600, subdivision (a) provides that an inmate may be deprived of those rights only "as is reasonably related to legitimate penological interests." Flinner did not object to the introduction of his letter to Representative Hunter on this or any other ground in the trial court and has thus forfeited this claim. Any error would also be harmless under any standard, given the wealth of similar evidence that Flinner attempted to place blame for Keck's murder on the North Korean gambling industry and various employees and associates.

In sum, Flinner's objections to these eight writings are all either forfeited or meritless. We also reject Flinner's claim that these writings were irrelevant or substantially more prejudicial than probative (Evid. Code, §§ 350, 352): These writings supported the prosecution's theory that Flinner attempted to obstruct the investigation and prosecution of the case, from which the jury could properly infer a consciousness of guilt. And none of the letters created a substantial risk of undue prejudice.

### 4. *Admissibility of Flinner's Statements Suggesting He Killed Keck*

Flinner contends that the trial court erred in admitting statements he made to his friend Gilberto Lopez, suggesting that Flinner killed Keck or had Keck killed. Flinner argues that these statements were hearsay and that they are insufficiently reliable to admit as statements against interest. Even if these statements were not inadmissible hearsay, he asserts, they should have been excluded as substantially more prejudicial than probative. He maintains that the admission of these

statements violated his rights to confrontation, a reliable penalty determination, and due process under the Sixth, Eighth, and Fourteenth Amendments.

Lopez testified that a few days after Keck's murder he went out to dinner with his girlfriend Marie Locke and Flinner.[10]  He recalled Flinner having two large drinks and described him as becoming "tipsy" and seeming "really sad, really down."  During the meal, Flinner stated, "I shouldn't have killed her."  On cross-examination, Lopez acknowledged Flinner may have just been "talking trash" that night, and that Lopez had thought at the time that Flinner was blaming himself but did not think Flinner was, in fact, responsible for Keck's death.  Lopez also testified about another occasion after the murder, in which Flinner had taken sleeping pills and was "acting all groggy, mumbling."  While Lopez was helping Flinner up to his bed, Flinner said, "I shouldn't have killed her."

Flinner's hearsay objection to the admission of this testimony lacks merit.  Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally

---

**10**    Flinner made no objection to Lopez's testimony.  The hearing to which Flinner points as containing an objection instead concerned a defense request for a mistrial arising from a related, but significantly different, event:  The subsequently stricken double-hearsay testimony (discussed further below) of Lopez's girlfriend, Marie Locke, about Lopez's relation to her of Flinner's statement in the restaurant.  In arguing for a mistrial, defense counsel at no point suggested that *Lopez's* testimony about the statement would be inadmissible.  The court denied the mistrial motion and a related motion to strike the testimony of an investigator but did not rule on any question regarding testimony by Lopez himself.  Despite the lack of an objection, the Attorney General does not assert the claim is forfeited.

inadmissible. (Evid. Code, § 1200.) But there are a number of exceptions to this rule. One, the party-admission exception codified in Evidence Code section 1220, covers "[e]vidence of a statement . . . when offered against the declarant in an action to which he is a party . . . ." Flinner was of course a party to this action. The parties focus on another, related exception to the hearsay rule, the exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (*Id.*, § 1230.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610–611 (*Duarte*).) "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) We review the application of the statement against interest exception to the particular facts of a case for abuse of discretion, but whether a trial court has correctly construed Evidence Code section 1230 is a question of law that we review de novo. (*People v. Grimes* (2016) 1 Cal.5th 698, 712.)

The trial court did not abuse its discretion in admitting Flinner's statements to Lopez, regardless of whether we focus on the statement of party opponent exception in Evidence Code section 1220 or the statement against interest exception in Evidence Code section 1230. Although Lopez's testimony was offered by codefendant Ontiveros rather than by the People, it was nonetheless "offered against" Flinner within the meaning of Evidence Code section 1220. As discussed earlier, Ontiveros's defense was antagonistic to Flinner's: Ontiveros sought to show Flinner manipulated him into participating in Keck's killing, while Flinner denied all involvement. Lopez's testimony that Flinner took responsibility for killing Keck clearly harmed Flinner's case, as well as helping Ontiveros's. (Cf. *People v. Allen* (1976) 65 Cal.App.3d 426, 433 [to be relevant under Evid. Code, § 1220, "the statement must assert facts which would have a tendency in reason either (1) to prove some portion of the proponent's cause of action, or (2) to rebut some portion of the party declarant's defense"].)

As for section 1230, Flinner does not dispute that he was "unavailable as a witness" within the meaning of Evidence Code section 1230, since he had asserted his Fifth Amendment right not to testify. And his statements that he should not have killed Keck are, on their face, clearly contrary to his penal interests as they admit culpability for her murder.

Flinner nevertheless argues that the circumstances surrounding the two statements establish that they are not sufficiently disserving of his interests nor sufficiently reliable to justify admission. Flinner notes that he was under the influence of alcohol or sleeping pills when he allegedly made these statements and that Lopez may not have taken them literally. He relies on *Duarte, supra,* 24 Cal.4th 603, in which the

declarant admitted shooting at a house, but did so by minimizing his own culpability, suggesting that the defendant bore a greater culpability for the crime than the declarant. The declarant's statement was made to police shortly after he had been arrested and after he had learned that the police had evidence linking him to the crime. We held that not only were portions of the declarant's statement improperly admitted because they were not " 'specifically disserving' " of his penal interest (*id.* at p. 613), but also that under these circumstances — " 'where a declarant in police custody seeks to exculpate himself by implicating another suspect' " — the statement "lacked sufficient indicia of trustworthiness" and was inadmissible as a whole (*id.* at p. 618).[11] But here, by contrast, no portion of Flinner's statements sought to shift blame for Keck's death away from himself, and he made the statements to a close friend, first at an intimate dinner and then in the privacy of his home. While the statements were made under the influence of alcohol or sleeping pills, no testimony suggests that Flinner was unable to understand what he was saying. (Cf. *U.S. v. Two Shields* (8th Cir. 2007) 497 F.3d 789, 792–793 [where declarant made nonverbal statement at hospital with blood alcohol level of .389 and was described as "unintelligible" by doctor, he could not appreciate that the statement was against

---

[11] Flinner erroneously reads the *Duarte* court as including the declarant's intoxication at the time of the statement as one of the circumstances undermining the reliability of the statement. But the declarant in *Duarte* had emphasized he was very drunk *at the time of the shooting*, as part of his effort to reduce his own culpability. (*Duarte, supra,* 24 Cal.4th at p. 615.) The *Duarte* declarant was not intoxicated at the time he made the disputed statement against interest to the police, and the case thus does not serve Flinner's purposes.

his interests and thus it lacked sufficient indicia of reliability and was inadmissible].)  And finally, while the jury was certainly entitled to consider Lopez's relatively innocuous interpretation of Flinner's comments, Lopez's interpretation could not have precluded the jury from drawing a more incriminating inference.  Under these circumstances, the trial court did not abuse its discretion in admitting Flinner's hearsay statements as statements against his penal interest.

Nor were these statements inadmissible under Evidence Code section 352 as substantially more prejudicial than probative.  The prejudice contemplated by section 352 typically involves a potential for evoking an emotional bias against the defendant on legally irrelevant or improper grounds; it is not the " ' "damage to a defense that naturally flows from relevant, highly probative evidence." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.)  Nothing in Flinner's statements that he should not have killed Keck would inflame the emotions of the jury in this way.

In sum, we conclude the trial court properly admitted Flinner's statements to Lopez.  We thus reject Flinner's argument that the admission of these statements violated his Sixth, Eighth, and Fourteenth Amendment rights.[12]

---

[12]    Having concluded that Lopez's testimony was properly admitted, we reject Flinner's argument that the improper admission of the testimony "aggravated" the harm caused by the stricken testimony of Lopez's girlfriend, Marie Locke.  Locke, who was at the dinner with Flinner and Lopez, testified about the dinner before Lopez did.  She stated that Lopez told her that Flinner said, "I shouldn't have killed her" that night, but that she had not personally heard the statement.  The trial court

### 5. *Admissibility of Evidence of Keck's Pregnancy*

Flinner argues that the trial court erred in admitting evidence that Keck may have been pregnant when she was killed. He asserts that evidence of Keck's pregnancy was not relevant to any issue in dispute and that, even if relevant, its probative value was substantially outweighed by its prejudicial impact on the jury. Flinner also claims the admission of this evidence violated his rights to a reliable penalty determination and due process under the Eighth and Fourteenth Amendments.

Before trial, the prosecution moved to admit evidence about Flinner's strained relationship with Keck — including evidence of Flinner's displeasure with her possible pregnancy — as relevant to establishing his motive for her murder and because it tended to refute Flinner's claim that he was deeply in love with Keck, wanted to marry her, and wanted to father her child. Included in this motion was the prosecutor's plan to introduce the testimony of Melissa Henderson and Nathalie Reed, who would each testify that Flinner discussed Keck's pregnancy with her soon after Keck's murder and expressed displeasure with the pregnancy. Flinner objected generally to evidence of his strained relationship with Keck, arguing it was irrelevant because the prosecution's theory of the case was that Flinner had Keck killed in order to collect insurance money, not because of any relationship problems. Although the trial court excluded some of the evidence of the state of Keck's and Flinner's

properly struck this portion of Locke's testimony as inadmissible double hearsay and admonished the jury to disregard it. We presume the jury followed the court's instructions as to Locke's testimony (*People v. Sanchez, supra*, 26 Cal.4th at p. 852), and Lopez's testimony clearly did not suffer from the same defect.

relationship as substantially more prejudicial than probative under Evidence Code section 352, it admitted much of it, including the planned testimony of Henderson and Reed. Defense counsel preserved the objection that this evidence was irrelevant and, even if relevant, should have been excluded under Evidence Code section 352. Also before trial, Flinner objected to the planned expert testimony of the pathologist who conducted Keck's autopsy that Keck's ovaries and uterus suggested that she may have been in the early stages of pregnancy at the time of her death.

At trial, the prosecutor introduced photos of a pregnancy test found in Keck's truck at the scene of the crime, as well as a Walmart receipt showing that she had purchased the test just before she was killed. Henderson testified that she met Flinner on a phone chat line in June 2000, shortly after Keck's death, and that Flinner told her his fiancée had been pregnant and he was "dreading her being pregnant." Reed testified that she worked at a casino that Flinner frequented and that after Keck's death, Flinner said Keck was "lying" about the pregnancy "and she was trying to get him to marry her and he wasn't going to do that." Defense counsel renewed his objection on Evidence Code section 352 grounds, and the trial court again overruled the motion. Kim Milan then testified that she met Flinner through Lopez and during one conversation asked Flinner if he had killed Keck. He replied, "I know they think I did it, but why would they want to believe that? She was pregnant with my baby and we were about to be married." Gregory Sherman, who met Flinner in jail, testified that Flinner discussed his "wife" and said that she was pregnant when she was killed. Over Flinner's objection, the prosecutor introduced letters that Flinner wrote to religious organizations from jail, blaming a

former employee for killing Keck after an affair. In these letters, Flinner references Keck's pregnancy, speculating that she was having an affair with the former employee that led to the pregnancy. Finally, the pathologist testified that the state of Keck's ovaries and uterus were suggestive of pregnancy but conceded on cross-examination that he could not say for sure that she was pregnant.

Although Flinner now claims error in the admission of all evidence concerning Keck's pregnancy, he did not raise all of these objections at trial. In particular, he did not object to the relevant portions of the testimony of Milan and Sherman, nor to the photos of the pregnancy test and Walmart receipt. Flinner's objection as it applies to these pieces of evidence is thus forfeited.

His objection to all evidence concerning Keck's pregnancy as irrelevant or unduly prejudicial also fails on the merits. As at trial, Flinner argues that evidence of Keck's pregnancy was irrelevant because the prosecution's theory of the case was that Flinner arranged Keck's death in order to collect on her life insurance policy, and there was no evidence suggesting that she was pregnant, or that Flinner believed she was, when he insured her life. As support for his argument, Flinner points to *People v. Cash* (2002) 28 Cal.4th 703, 729, where we held that an attempted murder victim's pregnancy was "clearly irrelevant" to any issue in the case. There, the defendant shot the victim in the course of committing a robbery and had no personal relationship with the victim apart from renting a room in her boyfriend's house. Neither the defendant's relationship to the victim nor the victim's pregnancy had any bearing on the case. Here, by contrast, Flinner's displeasure with Keck's pregnancy provides an additional motive for her murder and is probative of

why he decided to have her killed at the time he did. Flinner's belief that Keck was pregnant is also relevant to the financial motivations for Keck's murder, insofar as Flinner had expressed irritation with the financial strain that Keck placed on him, which might be expected to increase with the arrival of a new baby. Keck's own belief that she may have been pregnant, as evidenced by the pregnancy test found in her car, and the pathologist's testimony that Keck may have been pregnant, are relevant because they tend to corroborate Flinner's belief that Keck was pregnant.

We also reject Flinner's claim that this evidence is substantially more prejudicial than probative. The kind of evidence that Evidence Code section 352 excludes is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Scott*, *supra*, 52 Cal.4th at p. 491.) We recognize that in some instances, as in *Cash*, a victim's pregnancy may have little or no relevance to the guilt phase of a trial and may serve only to inflame the emotions of the jury. But here, Keck's possible pregnancy was probative of Flinner's motive for her murder, and — against the backdrop of evidence that he hired a hitman to kill his teenage fiancée for insurance money — we do not think this evidence was so uniquely damaging as to require its exclusion. Flinner also argues that the pathologist's testimony, even if relevant, was too speculative to present to the jury in light of its prejudicial impact. The pathologist properly presented his expert opinion based on the autopsy; that he could not say for sure that Keck was pregnant goes to the weight a reasonable juror would assign it, not its admissibility.

We conclude the trial court did not abuse its discretion in admitting evidence of Keck's possible pregnancy and reject Flinner's statutory and constitutional claims to the contrary.

### 6.  *Martin Baker's Competence to Testify*

Through the testimony of Martin Baker and other witnesses, the prosecution sought to show Flinner had attempted to frame Baker for Keck's murder.  Flinner contends that Baker was incompetent to testify under Evidence Code section 701, subdivision (a) and lacked the requisite capacity to perceive and recollect in order to testify under Evidence Code section 702, subdivision (a).  He argues that the trial court's failure to disqualify Baker as a witness and refusal to strike Baker's incoherent testimony violated his Sixth, Eighth, and Fourteenth Amendment rights to cross-examination, due process, and a reliable penalty determination.

When a witness's competency to testify at all, or to testify as to a particular matter, is questioned, we start from the general rule that "[e]xcept as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700.) A person is completely disqualified from testifying under Evidence Code section 701, subdivision (a) if he or she is "(1) [i]ncapable of expressing himself or herself concerning the matter so as to be understood . . . or [¶] (2) [i]ncapable of understanding the duty of a witness to tell the truth." "Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be

upheld in the absence of a clear abuse of discretion." (*People v. Anderson* (2001) 25 Cal.4th 543, 573 (*Anderson*).)

Here, the record does not support the claim that Baker lacked the capacity to communicate so as to be understood or that he was unable to understand the duty of truthful testimony. Baker worked for Flinner's landscaping business. The prosecution called Baker as a witness to testify that Flinner tried to frame Baker for Keck's death and to establish the independent poisoning charge. When the prosecution first called Baker, the court held a preliminary Evidence Code section 402 hearing in front of the jury to "assess Mr. Baker's apparent condition and circumstances," asking the prosecution to first "inquire of Mr. Baker as to who he is and what he's been doing presently and in the recent past," without "get[ting] into any substantive matters." Baker demonstrated his ability to communicate when he testified as to his early life, his education, and his family. Flinner points out that Baker initially refused to answer questions concerning his siblings' ages, saying, "I plead the 5th," but this does not establish that Baker did not understand his duty to testify truthfully. His reluctance to respond stemmed from his sense that the question was "pretty personal" and that the case "has nothing to do with [his] family," but he acquiesced as soon as the court admonished him that as a witness, he must answer questions honestly and to the best of his ability. We are satisfied that the trial court did not abuse its discretion in concluding that, although Baker may be "a bit different," he was nevertheless qualified to testify. (See *People v. Lewis* (2001) 26 Cal.4th 334, 361 [witness diagnosed as having intellect of a seven year old was not disqualified from testifying even though he "often responded in incomplete, sometimes

nonsensical, sentences," and testified that he " 'heard' " blood and knew how money " 'sounds' "].)

Even if a witness is not disqualified as incompetent under Evidence Code section 701, subdivision (a), his or her testimony on a *particular matter* (other than expert opinion testimony) is inadmissible "unless [the witness] has personal knowledge of the matter." (*Id.*, § 702, subd. (a).) "In order to have personal knowledge, a witness must have the capacity to perceive and recollect." (*People v. Lewis*, *supra*, 26 Cal.4th at p. 356.) "A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible." (*Anderson*, *supra*, 25 Cal.4th at p. 574.)

Our review of the record confirms that, although Baker departed on odd and incoherent digressions during his testimony, there was substantial evidence from which a rational trier of fact could conclude that Baker perceived and recollected the events of the night that Flinner poisoned him and attempted to frame him for Keck's murder. Flinner points to isolated portions of Baker's testimony that Flinner claims show that Baker's mental illness or drug use rendered him unable to perceive and recollect the events of that night. For instance, when asked at what time he began to feel less groggy after eating the chili provided by Flinner, Baker responded: "A few days after that. It was like a reoccurring of a myth is what I felt like. [¶] . . . [¶] . . . Something like in a previous livelihood specting [*sic*] him reincarnated, someone getting reincarnated in a certain fashion. It would never work, say for instance,

Adol[f] Hitler, he would never want to come back to life. But people would want him to come back to life, so people would have to use certain individuals." In another instance, when asked about what kinds of problems he reported having to the County Mental Health Hospital (CMH) a few months after the chili incident, Baker replied: "It put me in a state of mind like they wanted my backbone for this. It started off like as a quote of a price, like it started off at $35,000. And as my ride went into CMH, after sedation you could hear they were going for like a bid. But it was like a music box going off. You know, it was premeditated. So I just went along with it. The highest price was like 87 million dollars. I just went with it."

As Flinner points out, the jury also heard Baker's testimony that he had used methamphetamine a few days before the evening at Flinner's house, as well as Baker's testimony about his broader past drug usage and mental health issues, including "delusions" that caused him to check into CMH a few months after the evening in question. The jury was presented with evidence that Baker tested positive for methamphetamine, THC, and Xanax after being taken from Flinner's apartment to the sheriff's substation. And the jury heard the expert testimony of a psychiatrist, who reviewed Baker's medical records from his time at CMH and testified that Baker was "having a very severe problem with psychosis, with hallucinations and psychotic delusions" and who conveyed his expert opinion that such a person's "ability to accurately perceive what's going on in the real word [*sic*] is severely impaired."

But " '[t]he fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect . . . .' [Citation.] Nor does a witness's

mental defect or insane delusions necessarily reflect that the witness lacks the capacity to perceive or recollect." (*People v. Lewis, supra,* 26 Cal.4th at p. 356.) Despite these isolated digressions, Baker was consistently brought back to the relevant events by the prosecutor's and defense counsel's questioning. He was able to testify coherently about his work for Flinner's landscaping business, about how Flinner invited him to dinner and offered him a bowl of chili, that Flinner also ordered a pizza for himself and did not have any of the chili, and about how he became drowsy five to 10 minutes after he ate the bowl of chili. He recalled being awoken in the early hours of the morning by sheriff's deputies who were responding to a complaint that he had been running around the pool and yelling and related how he was taken to the sheriff's substation to have his blood drawn and urine sample taken. Thus, "[a]lthough [Baker's] testimony may have consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations," he " 'presented a plausible account' " of his relationship with Flinner and the evening's events. (*Lewis,* at p. 357; see *Anderson, supra,* 25 Cal.4th at pp. 574–575 [trial court properly allowed witness's testimony about murder despite her delusion that her imaginary son was present at the murder].) Nor were the deficiencies in Baker's capabilities as a witness hidden from the jury, which was given an "ample basis upon which to judge the reliability of [Baker's] observations." (*Anderson,* at p. 575.)

In sum, the trial court did not err in permitting Baker to testify or in failing to strike his testimony on these matters. We reject Flinner's argument to the contrary and his related constitutional claims.

### 7. *Admissibility of Portions of Codefendant's Confession to Police*

Flinner contends that the trial court erred in admitting portions of his codefendant Ontiveros's confession to police and that the admission of these statements violated his confrontation clause rights under the Sixth and Fourteenth Amendments to the United States Constitution. We agree there was error but conclude that it was harmless beyond a reasonable doubt.

Before trial, the prosecution conceded that two juries were appropriate in this case but sought to establish that certain parts of Ontiveros's confession to police would be admissible before Flinner's jury. Flinner moved in limine to exclude all of Ontiveros's statements to police as inadmissible hearsay whose admission would violate Flinner's confrontation clause rights. The trial court determined that certain portions of Ontiveros's confession that inculpated Ontiveros alone and did not explicitly or implicitly refer to Flinner were sufficiently trustworthy to be admitted against Flinner as statements against the declarant's interest.

At trial, Ontiveros did not testify. With only Flinner's jury present, the prosecution offered the approved statements against interest through Detective Scully, who interviewed Ontiveros after his arrest. To ensure that the jury heard only the narrow, approved statements from Ontiveros's confession, the prosecutor read verbatim portions of the interview transcript and asked Detective Scully whether the answers in the transcript were the ones that Ontiveros gave him. By this means, the prosecutor introduced Ontiveros's admissions that on the day of Keck's killing he was driving the white Nissan NX car by himself, and that Keck picked him up, drove him to the

cul-de-sac, and parked her car facing the Nissan in the cul-de-sac.

After the jury returned the guilt verdicts but before sentencing, the high court issued its decision in *Crawford*, *supra*, 541 U.S. 36, where it held that the admission of testimonial hearsay statements against a criminal defendant violates the confrontation clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. Flinner moved for a new trial, arguing that Ontiveros's statements were inadmissible against Flinner under *Crawford*. The trial court agreed that the admission of Ontiveros's statements fell afoul of *Crawford* but ruled that their admission was subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18, and was harmless beyond a reasonable doubt. It accordingly denied Flinner's motion for a new trial.

Flinner renews his trial arguments that the introduction of Ontiveros's statements through Detective Scully's testimony violated the confrontation clause under *Crawford* and that the error necessitates a new trial. The Attorney General responds that Ontiveros's statements are admissible under pre-*Crawford* case law concerning the introduction of a codefendant's confession in a joint trial — namely, *Bruton*, *supra*, 391 U.S. 123, and *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*). And he argues that *Crawford* does not bar the admission of Ontiveros's statements because Ontiveros's statements neither accused Flinner of anything nor mentioned the involvement of anyone other than Ontiveros in Keck's murder.

The Attorney General's reliance on *Bruton* and *Richardson* is misplaced. "In *Bruton*, the United States

Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. [Citation.] The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' [Citation.] Such a context is presented when 'the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 453 (*Lewis*).) As we explained in *Lewis*, "[t]he high court limited the scope of the *Bruton* rule in *Richardson* . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. [Citation.] That is because, '[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.' [Citation.] Accordingly, the high court held, 'the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the

defendant's name, but any reference to his or her existence.' " (*Lewis*, at p. 454, italics omitted.)

The Attorney General argues that under *Richardson*, Ontiveros's statements were admissible because nothing in Ontiveros's statements expressly inculpates Flinner. But the codefendants in *Bruton* and *Richardson*, unlike those here, were jointly tried in a case *before a single jury*, and both cases rested on the premise that the nontestifying defendant's confession was inadmissible against the codefendant. In each case, the trial court imposed a limiting instruction to the jury that it could only consider the confession as evidence against the declarant and not against the codefendant. (See *Bruton, supra*, 391 U.S. at p. 125; *Richardson, supra*, 481 U.S. at pp. 204–205.) The high court had to decide whether the limiting instruction sufficed to protect the codefendant's confrontation rights. In other words, the question in these cases was not whether a nontestifying defendant's confession is admissible against his codefendant; the opinions assumed that it was not. The question, instead, was whether — given that the defendant's confession was only admissible against him and not his codefendant — a limiting instruction by the court is sufficient to protect the codefendant's confrontation rights. Here, Flinner and Ontiveros were jointly tried but before two separate juries. No limiting instruction was given — indeed, the relevant testimony by Detective Scully was offered only to *Flinner's* jury — because the trial court expressly determined that Ontiveros's statements were admissible against Flinner as statements against interest. For these reasons, *Bruton* and *Richardson* are simply irrelevant here. (See also *People v. Brown* (2003) 31 Cal.4th 518, 537 [*Bruton* rule inapplicable where defendants are not jointly tried].)

The Attorney General's *Crawford* argument fares no better. *Crawford* held that the admission of testimonial hearsay statements violates a criminal defendant's confrontation rights unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford*, *supra*, 541 U.S. at p. 68.) Because Ontiveros invoked his right not to testify and Flinner had no prior opportunity to cross-examine him, the introduction of Ontiveros's statements to Detective Scully violated the confrontation clause if those statements are "testimonial." In *Crawford*, the high court held that "[w]hatever else th[at] term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; *and to police interrogations*," for these are "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Crawford*, at p. 68, italics added.) Here, the statements the trial court admitted are ones that Ontiveros made after his arrest, while in custody, in response to questioning by Detective Scully, and as part of his confession to playing a role in Keck's murder. There can be no doubt that these statements are testimonial, and the Attorney General does not seriously contend otherwise.

The Attorney General argues instead that the "chief evil" that *Crawford* sought to prevent is the introduction of "*accusatory* testimonial statements." Because Ontiveros's statements did not explicitly or implicitly accuse Flinner of anything, the Attorney General reasons that Flinner's confrontation rights were not implicated by their admission. But the high court has already rejected a similar argument. In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, the high court concluded that the affidavits of crime lab analysts certifying that a substance found in the defendant's possession

77

was cocaine "were testimonial statements" and that "the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Melendez-Diaz*, at p. 311.) In so doing, the high court rejected Massachusetts' argument that "the analysts are not subject to confrontation because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing; rather, their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband." (*Id.* at p. 313.) The court rejected this distinction between accusatory and nonaccusatory witnesses: "The text of the [Sixth] Amendment contemplates two classes of witnesses — those against the defendant and those in his favor. . . . Contrary to respondent's assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." (*Melendez-Diaz*, at pp. 313–314.) Similarly, in *Williams v. Illinois* (2012) 567 U.S. 50, 135, a majority of the court rejected the plurality's reasoning that a statement must be " 'prepared for the primary purpose of accusing a targeted individual' " in order to be testimonial, pointing to the high court's reasoning in *Melendez-Diaz*. (*Williams*, at p. 135 (dis. opn. of Kagan, J.), quoting *id.* at p. 84 (plur. opn. of Alito, J.); accord, *U.S. v. Duron-Caldera* (5th Cir. 2013) 737 F.3d 988, 994–996.)

We conclude the Attorney General's argument fails for the same reason. The prosecution offered the approved portions of Ontiveros's confession before Flinner's jury out of the presence of Ontiveros's jury, presumably because these statements corroborated the prosecution's theory that Flinner had hired Ontiveros to kill Keck. The fact that the selected statements do not explicitly mention Flinner does not render Ontiveros any

less a "witness[] against" Flinner within the meaning of the Sixth Amendment.

The Attorney General suggests we have held otherwise in *People v. Stevens* (2007) 41 Cal.4th 182 and *Lewis, supra,* 43 Cal.4th 415, where we reasoned that "[t]he same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.'" (*Stevens*, at p. 199; accord, *Lewis*, at p. 506.) But as with *Bruton* and *Richardson, Stevens* and *Lewis* have no application here: Both concerned the admission of a codefendant's statement at a joint trial before a single jury. The codefendant in *Stevens* also testified at the joint trial and was thus available for cross-examination, obviating any confrontation clause problem. (*Stevens*, at p. 199.)

In *Lewis*, redacted portions of the codefendant's confession to police were read to the jury and the "jury was instructed to consider these statements against the speaker only and not against any other defendant." (*Lewis, supra,* 43 Cal.4th at p. 452.) Although we agreed with the defendant that the admitted statements from his codefendant's confession were "no doubt testimonial," we reasoned that the statements were not admitted "against" the defendant within the meaning of the confrontation clause because they did not facially implicate the defendant. (*Id.* at p. 506.) We noted: "As the high court has explained, '[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a codefendant.' [Citation.] The only exception to this rule is the narrow class of statements . . . that powerfully incriminate the defendant on their face because they directly implicate the defendant by name or do so in a manner the jury could not reasonably be expected to ignore. [Citations.]

79

Accordingly, redacted codefendant statements that satisfy *Bruton*'s requirements are not admitted 'against' the defendant for *Crawford* purposes." (*Lewis*, at p. 506.) By contrast, as we have already explained, Ontiveros's statements were expressly admitted against Flinner.

For these reasons, we agree with the trial court that the admission of Ontiveros's statements against Flinner violated Flinner's confrontation clause rights. The question remains, however, whether the error was harmless beyond a reasonable doubt. (See *Lilly v. Virginia* (1999) 527 U.S. 116, 139–140.) On this question, too, we agree with the trial court. Nothing elicited from Ontiveros directly implicated Flinner, whose involvement in the scheme to kill Keck was proven by independent evidence. And even as to the manner in which Ontiveros implemented the final phase of that scheme, the killing itself, other evidence illuminated most of the details: Photos and videos from nearby surveillance cameras showed Keck's and Ontiveros's movements into and (in Ontiveros's case) out of the cul-de-sac, and the crime scene and forensic evidence showed Keck was shot in the back of her head while opening the hood of her car, which was still running. As we conclude in the next discussion section, there was ample evidence, independent of Ontiveros's statement, that he accompanied Keck to the cul-de-sac and waited until she was occupied opening her hood before shooting her in the back of the head. As to both first degree murder and the lying-in-wait special circumstance, therefore, Ontiveros's statement that Keck drove him to the cul-de-sac and parked her car facing his was cumulative of other prosecution evidence regarding the manner of Keck's killing. For that reason, and because the portion of Ontiveros's statement admitted in

Flinner's trial did not directly inculpate Flinner, its admission was harmless beyond a reasonable doubt.

### 8. *Sufficiency of the Evidence for the Lying-in-Wait Special-Circumstance Finding and the Lying-in-Wait First Degree Murder Conviction*

Flinner contends there was insufficient evidence to support his conviction for lying-in-wait first degree murder, as well as insufficient evidence to support the lying-in-wait special-circumstance finding.

"We often address claims of insufficient evidence, and the standard of review is settled. 'A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Moon* (2005) 37 Cal.4th 1, 22.)

The capital murder in this case occurred in June 2000, shortly after Proposition 18 amended the lying-in-wait special-circumstance statute. (Stats. 1998, ch. 629, § 2, pp. 4163–4166, enacted as Prop. 18, approved by voters, Primary Elec. (Mar. 7, 2000) eff. Mar. 8, 2000.) We consider the effect of that amendment below (pt. II.B.9., *post*), in addressing Flinner's argument that the amendment rendered the special circumstance unconstitutional. As relevant here, however,

"[l]ike the former version, the amended lying-in-wait special circumstance requires ' " ' 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . .' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 629 (*Johnson*).)  The lying-in-wait special circumstance (Pen. Code, § 190.2, subd. (a)(15)) includes the elements of first degree lying-in-wait murder (*id.*, § 189, subd. (a)), but requires the additional element that the killing was intentional, not merely committed with implied malice.  (See, e.g., *People v. Moon*, *supra*, 37 Cal.4th at p. 24, fn. 1.)  Thus, we focus here on whether substantial evidence supports the special circumstance, for if it does, it necessarily supports the theory of first degree lying-in-wait murder.  (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 388.)

Flinner concedes that the concealment element of the statute is satisfied here, where Flinner and Ontiveros concealed their purpose from Keck when they summoned her to the cul-de-sac on the pretense of jumpstarting Ontiveros's car.  And Flinner does not argue that he or Ontiveros lacked the intent to kill.  But Flinner maintains that the evidence was insufficient to establish a "substantial period of watching and waiting" and a "surprise attack from a position of advantage."

First, Flinner contends that the mere three minutes that elapsed between the time Keck's Mustang entered the cul-de-sac to the time Ontiveros drove away from the scene of the murder could not constitute a substantial period of watching and waiting.  But as we have repeatedly explained, the purpose of the watching and waiting element " ' "is to distinguish those

cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 278.)

Here, viewing the evidence in the light most favorable to the verdicts, we conclude that the prosecution presented sufficient admissible evidence from which a trier of fact could find beyond a reasonable doubt that Ontiveros watched and waited for an opportune moment to launch a surprise attack on Keck. The prosecution's theory of the murder was that Flinner called Keck and asked her to pick up Ontiveros from a nearby gas station and drive to a cul-de-sac where Ontiveros's car had broken down in order to give him a jumpstart. While Keck was facing her Mustang and opening its hood, Ontiveros shot her in the back of the head. The prosecution's evidence of how the actual killing occurred consisted largely of surveillance videos and stills from gas stations, stores, and businesses in the area, as well as forensic evidence of Keck's injuries and the state in which her car was found at the crime scene.[13] Video shows

---

[13] As we have explained, the trial court erred in admitting portions of codefendant Ontiveros's custodial confession. (See pt. II.B.7., *ante*.) Due to that error, the jury heard Ontiveros's statements that he drove the white Nissan NX car on the day of the murder and was alone in the car that day, that Keck picked him up and drove him to the cul-de-sac, and that Keck parked her car nose-to-nose with the Nissan in the cul-de-sac. Our past case law suggests that it would not be improper to consider these statements in assessing Flinner's sufficiency-of-the-evidence claim. (See *People v. Shirley* (1982) 31 Cal.3d 18, 70–71.) But

Keck's Mustang leaving the Ultramar station where she met Ontiveros and then heading towards the cul-de-sac road. Approximately three minutes and 15 seconds after her white Mustang enters the cul-de-sac, video shows the Nissan NX speeding out of it.

Deputy Sheriff Troy Doran testified that Keck's Mustang was found with the keys still in the car, the engine running, and the passenger door open. Photos of the crime scene showed that the hood of Keck's Mustang was ajar, though not propped open with the hood rod. And photos showed blood stains on the front bumper of the car, the underside of the hood, and on the hood rod, which was out of place. Robert Whitmore, who performed the autopsy, testified that he found a "textbook entrance wound" on the back of Keck's head, and that the lack of soot on the wound indicated that the gun was some distance away from her head when it was fired. He also testified that Keck sustained facial abrasions before she died, which he opined were consistent with her face hitting the engine compartment of the Mustang after she was shot. And he testified that he found no evidence of evasion by Keck, suggesting that she never saw the gunshot coming. The bullet thus passed through Keck's brain, exited through her right cheek, and finally lodged in the firewall of her car in the engine compartment. David Cornacchia, a blood spatter expert, testified that blood on Keck's leg and on the engine of the car were consistent with Keck being shot while holding open the hood and leaning over the engine. And even before the autopsy was performed, at a point when the

even without Ontiveros's confession, sufficient evidence supports the lying-in-wait special circumstance, and we do not rely on that confession here.

pathologist at the scene of the crime could not determine whether Keck had been shot in the back of the head or in the face, Flinner told witness Robert Pittman that Keck had been shot in the back of the head. In light of this substantial evidence, a reasonable jury could conclude that Ontiveros watched and waited at the cul-de-sac for the opportune moment to shoot Keck from behind: when Keck was facing her Mustang in order to lift the hood of the car to provide a jump start.

Flinner also argues that there is insufficient evidence that Ontiveros shot Keck from a position of advantage. He reasons that the fact that Keck was shot in the back of the head "does nothing to distinguish this case from any other such 'ordinary premeditated murder,'" quoting our decision in *People v. Morales* (1989) 48 Cal.3d 527, 557. As we explained in *Morales*, "a mere concealment of purpose" is not sufficient to establish lying in wait, since "many 'routine' murders are accomplished by such means, and . . . constitutional considerations . . . might well prevent treating the commission of such murders as a special circumstance." (*Ibid.*) Were there only evidence suggesting, for example, that Ontiveros drove up behind Keck while she had the hood of her car open and shot her from behind, we might agree with Flinner that the evidence could not distinguish the killing from an ordinary premediated murder not subject to a lying-in-wait special-circumstance finding. (Cf. *People v. Nelson* (2016) 1 Cal.5th 513, 551 [insufficient evidence for lying-in-wait special circumstance where evidence only showed the defendant "came up behind his victims on foot to take them by surprise" and no evidence showed that he "arrived before the victims or waited in ambush for their arrival"].) But here, as discussed above, the evidence tends to show that Ontiveros left the Nissan NX in the cul-de-sac in advance of

Keck's arrival, waited for Keck at the gas station, and drove with her back to the cul-de-sac.  The evidence further shows that Keck was shot while facing her car and opening the hood.  In light of this evidence, a jury could reasonably conclude that Ontiveros " ' " 'watch[ed] and wait[ed] for an opportune time to act' " ' " on the drive from the gas station to the cul-de-sac, while Keck parked and got out of the car, and while she proceeded to open the hood of the car, before launching " ' " 'a surprise attack' " ' " on Keck from an advantageous position:  from behind her as she was otherwise preoccupied with opening the hood.  (*Johnson*, *supra*, 62 Cal.4th at p. 629.)

### 9. *Constitutionality of Lying-in-Wait Special Circumstance*

Flinner argues that Proposition 18 rendered the lying-in-wait special circumstance indistinguishable from lying-in-wait first degree murder, and that the special circumstance is therefore unconstitutionally vague and fails to adequately narrow the class of death-eligible defendants, creating an arbitrary and capricious application of the death penalty in violation of the Eighth and Fourteenth Amendments.  We recently rejected this argument in *Johnson*, *supra*, 62 Cal.4th at pages 634 to 637, and Flinner offers no reason to reconsider that decision here.

"In assessing defendant's challenge to the amended lying-in-wait special circumstance, we are guided by the following constitutional principles.  The Eighth and Fourteenth Amendments prohibit a sentence of death 'imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner.'  [Citation.]  To satisfy this constitutional command, 'the trier of fact must convict the defendant of murder and find

one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. [Citations.] . . . [T]he aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. [Citation.] Second, the aggravating circumstance may not be unconstitutionally vague.' [Citation.] The lying-in-wait special circumstance is an 'aggravating circumstance[]' subject to these constitutional requirements." (*Johnson*, *supra*, 62 Cal.4th at pp. 634–635.)

As we explained in *Johnson*, "in March 2000, the voters passed Proposition 18, which changed the definition of the lying-in-wait special circumstance from a killing *while* lying in wait to a killing *by means of* lying in wait, mirroring the language of the first degree murder statute." (*Johnson*, *supra*, 62 Cal.4th at p. 634.) "[T]he voters' purpose in amending the lying-in-wait special circumstance was to eliminate the temporal distinction between the special circumstance and lying-in-wait first degree murder . . . thereby expand[ing] the class of cases in which the special circumstance could be found true . . . ." (*Id.* at p. 636.) Nevertheless, we concluded that the amended lying-in-wait special circumstance comports with the Eighth Amendment because it "adequately distinguishes itself from other murders and does so in terms that are not so vague as to permit arbitrary determinations regarding the truth of the special circumstance allegation." (*Johnson*, at p. 636.) As we have long held, the "factual matrix" presented by the lying-in-wait special circumstance — an intentional murder coupled with the elements of concealment, watching and waiting, and a surprise attack from a position of advantage — sufficiently distinguish it from " 'ordinary' premeditated murder" (*People v. Morales*,

*supra*, 48 Cal.3d at p. 557), such that it is "neither applicable to all murderers nor impermissibly vague" (*Johnson*, at p. 636). And, in *Johnson*, we reasoned that even if Proposition 18 had rendered the special circumstance *identical* to lying-in-wait first degree murder, the special circumstance would pass constitutional scrutiny because lying-in-wait murder "historically has been viewed as ' "a particularly heinous and repugnant crime," ' " which "provides 'a rational basis for distinguishing those murderers who deserve to be considered for the death penalty from those who do not.' " (*Johnson*, at p. 637.)

*Johnson* likewise forecloses Flinner's as-applied constitutional challenge to the special circumstance. Like the defendant in *Johnson*, Flinner here contends that "because his liability for lying-in-wait first degree murder as an aider and abettor required a showing of intent to kill, there was no meaningful distinction between that theory of first degree murder and the lying-in-wait special circumstance in his case." (*Johnson*, *supra*, 62 Cal.4th at p. 637.) This "is simply another way to state his facial attack on the statute" (*Lewis*, *supra*, 43 Cal.4th at p. 517), which we have rejected in part because — even were the special circumstance identical to the lying-in-wait first degree murder statute, as Flinner claims it is as applied to him in this case — it would not offend the Constitution.

### 10. Juror Misconduct

Based on information received from jurors after the penalty verdict was returned, Flinner moved for a new trial, alleging several instances of juror misconduct. The trial court held a multiday evidentiary hearing, at which numerous jurors testified, and denied the motion on the ground that no misconduct had occurred. On appeal, Flinner contends the

evidence showed reversible misconduct on the parts of Jurors No. 1 and No. 10. We review the factual background and hearing evidence before considering both these aspects of the misconduct claim.

During trial, defendant Flinner's jury was sometimes referred to as the "Red" jury and codefendant Ontiveros's as the "Green" jury. In December 2003, after both juries had returned their penalty verdicts and had been excused, the trial court received an e-mail message from two members of the Green jury relaying assertions by Red Juror No. 1 about misconduct by Red Jurors No. 10 and No. 12.[14] The messages also revealed that Juror No. 1 was interested in writing a book about the trial or her experiences as a juror and had been enlisting others in a possible group writing effort. The court provided the parties printouts of the e-mails in early January 2004. After investigation, Flinner filed a memorandum in support of his new trial motion alleging several instances of misconduct by Juror No. 1, Juror No. 10 and unspecified other jurors. The court set the matter for an evidentiary hearing in March 2004.

At the hearing, Juror No. 1 testified to the personal conflicts between her and Jurors No. 10 and No. 12 arising from what she saw as those jurors' misconduct. Throughout the trial, Juror No. 1 asserted, Jurors No. 10 and No. 12 acted in a "manipulative" manner, "attempt[ing] on a daily basis to swing the other[,] older women over to their way of thinking." During breaks in the courthouse hallway and cafeteria, they gave their opinion about the evidence the jury had just heard and, when anyone voiced a different view, "we were told how wrong we

_____

[14] Red jurors will hereafter be identified by their numbers alone; Green jurors will be identified as such.

were." By the time of deliberations, "[t]hose two girls had [the older women] wrapped up. They knew that they were going to get a guilty verdict out of them."

Jurors No. 10 and No. 12 also put together a weekly invitational lunch group that eventually grew to include most of the jury. Juror No. 1 testified she was never invited but did not feel slighted because she knew that the group discussed the case over lunch and she did not want to violate the court's admonition against such discussions. After a while during the trial, the group around Jurors No. 10 and No. 12 would stop talking whenever Juror No. 1 approached them; Juror No. 1 understood that to be because they knew that she was taking notes on what they said and "they were talking about things they shouldn't be."

Juror No. 1 testified she twice overheard Juror No. 10 say she had driven past the home of Flinner's parents on Harbison Canyon Road. The second time occurred after the wildfires in San Diego County in the fall of 2003; Juror No. 10 said she had to travel that road in order to visit relatives in the area.

Juror No. 1 also testified to remarks by Juror No. 10 suggesting a prosecution bias on her part. Juror No. 10 sometimes wore tight blouses and short skirts. Once, when Juror No. 1 and others told her the buttons on her blouse had popped open, she said she did not care, that she wanted her blouse open so that Flinner would look at her and she could tell him that she wanted him dead. Later in her testimony, Juror No. 1 said she actually observed Juror No. 10 mouthing "I want to kill you," or "I want you dead," at Flinner. "Many times during side bars, many times I would turn around," Juror No. 1 testified, "and [Juror No. 10] would be doing it and . . . [h]er and 12 would be giggling about it." Still later, Juror No. 1 testified

she only saw Juror No. 10 do this once, though she also saw her making throat cutting gestures at times, usually during a side bar. Juror No. 1 also testified to hearing Juror No. 10 refer to the lead police investigator, Detective Scully, as "our detective" and comment to other jurors on his "cute . . . rear end."

The tensions between Jurors No. 1 and No. 10 came to a head during guilt phase deliberations, when Juror No. 1 saw Juror No. 10 conferring privately with the foreperson. In what Juror No. 1 described as a "blowup," she confronted them, and they said they had been strategizing about how to sway a holdout juror.

At the evidentiary hearing, Juror No. 1 acknowledged she had planned to write a book about her experience as a juror in a capital case. She kept extensive notes during the trial, in part with the book prospect in mind. She testified that she did not attempt to find a means of publication until after the trial, when she explored "tools on the internet that will allow you to do self-publishing with their assistance." She also testified, however, that in September 2003, during the trial, she e-mailed a self-publishing service about the possibility of a loan, giving them an estimate of January 2004 as the date she would be ready to discuss further steps. She received a positive response from the company (her testimony was unclear as to the date), but she never actually received any money.

After the trial, Juror No. 1 began drafting a book and discussed the idea with former Green jurors. But in January, a stranger in a mall parking lot approached her and threatened unspecified harm if she kept "testifying." This threat, together with some unexplained events at her home (hang-up telephone

calls and banging on her door at night) prompted her to abandon the book project and destroy her notes and draft.

Some of Juror No. 1's assertions were corroborated by other jurors. Jurors No. 10 and No. 12 admitted that during the trial breaks they joked about Detective Scully having a nice butt. Juror No. 3 and members of the Green jury corroborated Juror No. 1's testimony that Juror No. 10 sometimes wore short skirts and tight blouses. Green Juror No. 11 testified to seeing Juror No. 10 use a water bottle to mime oral sex during a court session, and Green Juror No. 10 testified that Juror No. 10 parted her legs so that Detective Scully could see up her skirt. On cross-examination, though, Green Juror No. 10 admitted he could not actually see up Juror No. 10's skirt and did not know whether Detective Scully could.

Generally, however, Juror No. 1's assertions of misconduct by her fellow jurors were not corroborated. Jurors No. 10 and No. 12 denied discussing the evidence at breaks or lunch during the trial; when they did talk about witnesses who had appeared, it was only to comment on their dress or speculate on how long they would testify. Other jurors agreed the hallway and lunch conversations did not involve the evidence, though Juror No. 7 recalled one occasion, early in the trial, when she began to talk about a witness in the hallway but stopped when Juror No. 1 reminded her of the admonition. Juror No. 10 denied having ever attempted to communicate with Flinner across the courtroom, and no other juror corroborated Juror No. 1's account. Juror No. 10 also denied having deliberately parted her legs in the direction of Detective Scully or anyone else in the courtroom or having made any sexual gesture with her water bottle. Juror No. 10 also denied having deliberately visited the

home of Flinner's parents; she had to drive on their road to reach her children during the fire emergency.

The trial court denied Flinner's new trial motion on factual grounds. Were Juror No. 1's assertions of misconduct correct, the court opined, Flinner would be entitled to a new trial. But those misconduct claims were "[a]lmost in their entirety . . . rejected, countered, rebutted and/or innocently explained by the rest of the jurors." The court concluded Juror No. 1's antipathy for Juror No. 10, and her desire for the spotlight, had led her to engage in "grandiosity, puffery, hyperbole, gross exaggeration, speculation, flights of fancy, unsupported assumptions" and, where there was no more innocent explanation, "outright fabrication to further her own personal agenda." The court based its credibility determination on the hearing evidence and the court's observations of the jury during trial. Had there been juror misconduct as frequent and severe as Juror No. 1 had asserted, "it would not and it could not have escaped notice by the court, court personnel, counsel for the parties and the spectators." There had been "isolated violations" by the jurors of the court's admonitions, the court concluded, but none of a nature that "singly or in combination" substantially prejudiced the trial's fairness.

### a. Asserted Misconduct by Juror No. 1

Jury misconduct serious and extensive enough to impair the fairness of the trial or deliberations may warrant granting a new trial motion. (Pen. Code, § 1181, subd. 3; *People v. Collins* (2010) 49 Cal.4th 175, 242.) Where the trial court has heard evidence and made findings of historical fact regarding the alleged misconduct, we accept those findings if they are supported by substantial evidence. (*People v. Weatherton* (2014) 59 Cal.4th

589, 598; *People v. Pride* (1992) 3 Cal.4th 195, 260.) Whether those facts constitute misconduct is, however, a legal question we review independently. (*Collins*, at p. 242.)

Flinner contends Juror No. 1's exaggerations and fabrications about her fellow jurors, viewed in the context of her plan to write a book about her jury experience, demonstrate a bias on her part. Her efforts to make her contemplated book more "entertaining," he argues, show that "her literary project compromised her objectivity." Moreover, Juror No. 1's lack of credibility, Flinner maintains, shows she misconducted herself in deliberations: "She exaggerated various claims of juror misconduct, and for the same reason would likely have exaggerated the evidence." Finally, in a later section of his brief, Flinner argues alternatively that: (a) Juror No. 10 committed misconduct, as Juror No. 1 asserted; but (b) "if this court accepts the trial court's factual finding that Juror No. 1 fabricated her testimony, it must reverse because of Juror No. 1's perjury."

We accept the trial court's findings regarding Juror No. 1's credibility. The contrary testimony of other jurors, as well as the tenor of Juror No. 1's own testimony, amply supports the conclusion that her assertions of misconduct by other jurors were the product of speculation, gross exaggeration, and perhaps conscious fabrication. We note, however, that the trial court did not specifically find any particular part of Juror No. 1's testimony to be deliberately false. No finding of perjury was made, and Flinner does not demonstrate by argument from the record that any such finding was compelled.

Although Juror No. 1 made unwarranted accusations of misconduct against others after the trial's conclusion, we conclude the facts do not demonstrate she committed

94

misconduct during the trial or deliberations. Flinner himself engages in speculation by assuming that because Juror No. 1 gave exaggerated accounts of other jurors' behavior, she must similarly have distorted the trial evidence. There was no evidence at the new trial hearing that Juror No. 1 said or did anything in deliberations to distort the evidence bearing on guilt or penalty. To the contrary, other jurors, including the foreperson and Juror No. 10, found her contributions, many based on detailed notes of the evidence, appropriate and helpful.

Flinner's assertion that Juror No. 1's book idea led her make her unfounded and exaggerated claims of misconduct is also unsupported by the hearing evidence. Rather, as the trial court found, Juror No. 1's claims appear to have been generated by her "palpable" antipathy to Jurors No. 10 and No. 12 and by her desire to be the center of attention.[15] As far as the evidentiary hearing record discloses, Juror No. 1's plan to write

---

[15] The confrontation during deliberations that resulted from Juror No. 1's dislike of Juror No. 10 was unfortunate and disturbing to the participants — Juror No. 10 testified Juror No. 1 called her a "bitch" and screamed at her, reducing her to tears — but it did not derail the deliberations. Juror No. 10 also testified that after the incident, which occurred "at the very, very end of all of our decisions," the jury completed its deliberations and returned its verdicts; later, Juror No. 1 apologized for her "inappropriate" conduct, though Juror No. 10 did not feel the apology was sincere. Nor does the fact of an emotional confrontation between jurors necessarily indicate misconduct; it is not extraordinary for feelings among jurors to run high, especially in the context of disagreements during deliberations. (See *People v. Keenan* (1988) 46 Cal.3d 478, 541–542 [that one juror may have made an angry threat against another does not show reversible jury misconduct].)

a book about her jury experience did not cause her to misconduct herself in any other manner.

Flinner cites no authority suggesting that by itself a juror's plan to write a book about the case or the jury experience constitutes misconduct warranting reversal, and we have found none. It has been hypothesized that a juror's profit motive could lead the juror into controversial behavior "for the sake of making a story worth telling," or into "strong-arming the other members of the jury into an inequitable result that makes for good copy or a profitable film deal." (Note, *Capote in the Jury Box: Analyzing the Ethics of Jurors Writing Books* (2006) 19 Geo. J. Legal Ethics 643, 645; see *Sims v. Brown* (9th Cir. 2005) 425 F.3d 560, 577 [juror who discussed writing a book during trial did not commit prejudicial misconduct where "there is no suggestion that she had a financial interest in any particular outcome"].) In response to such dangers, California law prohibits offering or accepting a payment to a juror in exchange for information about a criminal case during trial or for 90 days after discharge (if the payment is greater than $50). (Pen. Code, § 116.5.) The hearing evidence, however, did not show any agreement to write a book for profit: Juror No. 1 testified without contradiction that while she had received a positive response to her book proposal and was hoping to borrow money to complete the project, she never obtained an agreement for payment of any amount.

Flinner compares Juror No. 1 to the hypothetical juror discussed in dictum in *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, 982, footnote 19, who "lies his way on [to the jury] because he secretly plans to write a memoir of the experience" and who, the court suggested, might then "vote differently to provide drama, or . . . inject personal prejudice into the jury room in an

attempt to jazz up the deliberative process." But while Juror No. 1 wrote on her questionnaire that she was "excited to be summoned" for jury service and that she thought Flinner's case would be "very interesting," there was no evidence she lied in order to be selected.[16]

### b. Asserted Misconduct by Juror No. 10

Flinner contends Juror No. 10 "exhibited a clear bias by telling appellant she wanted him dead and by her personal infatuation with the lead detective." He acknowledges that the trial court found untrue Juror No. 1's allegations in this regard but maintains that finding was unsupported by the record.

We disagree. The trial court's finding was supported by substantial evidence and was based on the court's assessment of the witnesses' credibility. As such, it is entitled to deference. (*People v. Nessler* (1997) 16 Cal.4th 561, 582.) Juror No. 10 denied making hostile gestures or expressions to Flinner, and no other juror corroborated Juror No. 1's account. Juror No. 10 admitted making remarks about Detective Scully's anatomy,

---

[16] Flinner faults Juror No. 1 for failing to disclose on her questionnaire that she had been among the persons protected by a protective order her sister had obtained against an abusive former boyfriend. But no question on the questionnaire specifically called for such information. Juror No. 1 did disclose her sister's history of drug addiction and related crime, which included an incident in which "[t]he group she hung with actually burned down her home." At the new trial hearing, she acknowledged she also should have referenced that incident in answer to the question whether she or members of her family had ever been victims of crime. The trial court made no finding that Juror No. 1 was deceptive regarding the protective order or her sister's former boyfriend, and we find nothing in the record that compels such a finding.

but denied any acts that would suggest an "infatuation," much less a "fixation." As for Green Juror No. 10's claim that he saw Juror No. 10 expose herself to Scully, cross-examination showed that to be mere speculation on his part.

Juror No. 10 may not have conducted herself with perfect decorum throughout the trial. But the trial court found she did not commit the misconduct Juror No. 1 attributed to her, and we uphold that finding as supported by substantial evidence.

## C. Penalty Phase Issues

### 1. Competence to Stand Trial

Flinner contends the court erred, after the guilt verdicts were returned, in declining to suspend trial proceedings under Penal Code section 1368 in order to determine his competence to stand trial.

Defendant Flinner's jury returned its guilt-phase verdicts on October 16, 2003, but those verdicts were ordered sealed while codefendant Ontiveros's jury continued deliberating. In the early morning of Sunday, October 19, jail personnel found Flinner, in his cell, in what the trial court, paraphrasing the jail records, described as "an apparent state of physical distress." Flinner was hospitalized and was discharged on the morning of Tuesday, October 21. Declaring that he had been told Flinner had attempted suicide, defense counsel moved to initiate competency proceedings under Penal Code section 1368. In opposition, the prosecutor asserted Flinner's apparent conduct on this occasion was consistent with his record of previous failed " 'attempts' " at suicide, other instances of malingering, and "manipulation and deceit," and did not suggest an inability to proceed with the penalty phase. The court heard and denied the motion on Thursday, October 23.

At the hearing, the court and counsel reviewed Flinner's recent medical records. The court asked Attorney Mitchell whether, with the additional information in those records, he wished to give his view as to Flinner's present competency to stand trial. Although Mitchell and cocounsel Resnick had met with Flinner the day before the hearing, Mitchell did not indicate Flinner acted or spoke in a manner suggesting incompetence. Mitchell believed himself "on the horns of a dilemma" as both Flinner's attorney and an officer of the court; although he made no representations as to Flinner's mental condition, he believed the examination and hearing requirements of Penal Code section 1368 had been triggered.

The prosecutor observed that the medical records showed Flinner's blood pressure and pulse at the time of his hospitalization, while elevated, were within the range that might be seen for a man of his age doing an intense physical activity and that when interviewed on October 21 by a sheriff's department employee, Flinner denied any suicidal thoughts and stated, " 'I don't really know what happened to me.' "

Summing up the record, the trial court added that when interviewed, Flinner denied taking any drug, prescription or nonprescription, to excess, and that the court's own observations at the October 23 hearing showed Flinner to be apparently alert, not in physical distress, and conversing with counsel in an apparently normal manner. The court found scant evidence Flinner's condition on Sunday was the result of a suicide attempt, but even if it was, the evidence did not indicate incompetence to stand trial.

"The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally

incompetent to stand trial. [Citations.] Section 1367 of the Penal Code, incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (*Id*., subd. (a); see *Dusky v. U.S.* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788] [competence requires ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" ' and ' "a rational as well as factual understanding of the proceedings against him" '].)" (*People v. Rodas* (2018) 6 Cal.5th 219, 230–231.)

"Penal Code section 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if 'a doubt arises in the mind of the judge' regarding the defendant's competence (*id*., subd. (a)) and defense counsel concurs (*id*., subd. (b)). This court has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense.' (*People v. Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942], discussing *Pate v. Robinson* (1966) 383 U.S. 375, 385–386 [15 L.Ed.2d 815, 86 S.Ct. 836].) 'Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence — testimony of prosecution witnesses or the court's own observations of the accused — may be to the contrary.' (*Pennington*, at p. 518.) As we have explained in more recent cases, substantial evidence for this purpose is evidence 'that

raises a reasonable or bona fide doubt' as to competence, and the duty to conduct a competency hearing 'may arise at any time prior to judgment.'" (*People v. Rodas, supra,* 6 Cal.5th at p. 231.)

We agree with the trial court that there was insufficient evidence of incompetence to call for suspension of criminal proceedings and a formal inquiry into competence to stand trial. The exact nature and cause of the medical crisis Flinner suffered on October 19 was unknown. After Flinner's release from the hospital, he denied having suicidal thoughts or overdosing on any drug. Even assuming Flinner did try to kill himself in jail, it is not clear that was the result of any mental disorder; defense counsel pointed to nothing in the medical records so indicating. (See *People v. Ramos* (2004) 34 Cal.4th 494, 509 [preference for receiving the death penalty and hoarding of medication for possible suicide attempt do not indicate incompetence].) Counsel said nothing to suggest Flinner was experiencing any difficulty understanding the proceedings or communicating with the defense team; nor did the court's own observations give any indication Flinner was having problems following the proceedings or communicating with counsel. In the absence of substantial evidence of incompetence, the court properly denied Flinner's Penal Code section 1368 motion.

### 2. *Cumulative Impact of Errors*

Flinner contends the errors and misconduct committed in his trial, considered cumulatively, deprived him of due process and a fair trial. We have found harmless the erroneous admission against Flinner of Ontiveros's statements detailing Ontiveros's killing of the victim (pt. II.B.7., *ante*) and the possibly erroneous admission of Flinner's letter to

Representative Hunter (pt. II.B.3.h., *ante*). Examining their potential impact together, we find them cumulatively harmless as well. Though both evidentiary issues, they went to different factual aspects of the prosecution case; their potential prejudice would not have a strong tendency to accumulate.

### 3. *Constitutionality of California's Death Penalty Law*

Flinner contends several aspects of California's death penalty scheme violate the United States Constitution. We have considered and rejected these claims before, and we decline to revisit the following holdings.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) Penal Code section 190.3, factor (a), which permits a jury to consider the circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Simon* (2016) 1 Cal.5th 98, 149; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v.*

*Rangel* (2016) 62 Cal.4th 1192, 1235; accord, *People v. McDowell* (2012) 54 Cal.4th 395, 444; *People v. Demetrulias* (2006) 39 Cal.4th 1, 40–41.) We have held that the Supreme Court's recent Sixth Amendment decisions (e.g., *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616]; *Cunningham v. California* (2007) 549 U.S. 270; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not affect our conclusions in this regard. (*Rangel*, at p. 1235.)

"Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution." (*People v. Winbush* (2017) 2 Cal.5th 402, 490.) Flinner also refers in passing to the lack of "intra-case" proportionality review, but he does not argue his death sentence was grossly disproportionate to the offense committed or to the treatment of other participants in the capital crime. (See *People v. Clark* (2016) 63 Cal.4th 522, 642.) Given the evidence that Flinner, a mature man acting on his own initiative, organized and participated in a callous and cold-blooded killing of his fiancée purely for his financial gain, we would not, were the claim made, conclude his sentence is grossly disproportionate to his individual culpability.

Finally, "California's use of the death penalty does not violate international law either by punishing certain first degree murders with death or by employing the procedures defendant complains of above." (*People v. Rhoades* (2019) 8 Cal.5th 393, 456.) "Defendant's argument that the use of capital punishment 'as *regular punishment* for substantial numbers of crimes' violates international norms of human decency and hence the

Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies." (*People v. Demetrulias, supra,* 39 Cal.4th at pp. 43–44.)

## III. DISPOSITION

The judgment of the superior court is affirmed.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**GREENWOOD, J.**[*]

---

[*] Administrative Presiding Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Flinner

_____

**Unpublished Opinion**
**Original Appeal**  XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S123813
**Date Filed:**  November 23, 2020

_____

**Court:**  Superior
**County:**  San Diego
**Judge:**  Allan J. Preckel

_____

**Counsel:**

Patrick M. Ford, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General,  Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Theodore Cropley and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patrick M. Ford
1901 First Ave., Suite 400
San Diego, CA 92101
(619) 236-0679

Christopher P. Beesley
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9161